Alden W. BAHR, Plaintiff-Respondent,

v.

STATE of Wisconsin INVESTMENT BOARD, Defendant-Appellant,†

Court of Appeals

*No. 93–1194. Submitted on briefs March 2, 1994.—Decided July 7, 1994.*

(Also reported in 521 N.W.2d 152.)

†Pettion to review denied.

379

382

383

For the defendant-petitioner the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *Bruce A. Olson*, assistant attorney general.

For the plaintiff-respondent the cause was submitted on the brief of *Lester A. Pines* of *Cullen, Weston, Pines & Bach* of Madison.

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

EICH, C.J.

## I. Background

Alden Bahr had worked as a State Investment Board research analyst—a classified civil service position—for many years. As a member of the classified service, Bahr had certain statutory rights, including the right to be fired only for cause. In 1988, a law became effective moving all nonclerical positions at the board to the unclassified service. Persons in the unclassified service may be discharged at will. Five months after the reclassification of his position, Bahr received notice that he was being fired. The notice did not specify any reasons for the board's action.

Bahr sued the board, seeking a judgment declaring that the reclassification of his position and his subsequent firing deprived him of a protected property interest. He also claimed that his discharge violated the provisions of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-34.

The board's answer asserted that Bahr's action was barred by principles of sovereign immunity. Bahr moved for summary judgment and the trial court granted the motion, rejecting the board's argument and ruling (a) that the reallocation of his position to the

unclassified service did not abrogate the "vested property interest" Bahr had acquired in his job under the civil service laws, and (b) that the board violated his due process rights by firing him without a determination of just cause for his removal.[1]

Shortly thereafter, the trial court held a scheduling conference and, after extensive discussion with counsel, concluded that no further proceedings were necessary in the case. The court ordered the board to reinstate Bahr to his former position at the same pay and benefit level to which he would have been entitled if his employment had not been interrupted by the discharge. In so doing, the court rejected the board's claim that the court lacked authority to order retrospective monetary relief, such as "back pay and benefits" for Bahr.

The parties then stipulated that the back pay to which Bahr was entitled under the court's rulings was approximately $106,000, and that all further proceedings be stayed pending resolution of the board's appeal.

## II.  Issues

We are asked to determine on appeal:  (1) whether the board partakes of the sovereign's immunity from suit; (2) if it does not, whether Bahr's right as a classified civil service employee to be discharged only for cause survived the legislative reclassification of his position; and (3) if that right survived, whether the

---

[1] The trial court also denied the board's motion for summary judgment to dismiss Bahr's age discrimination claim and stayed further proceedings on the matter pending determination of that claim in proceedings pending before the personnel commission and the federal Equal Employment Opportunities Commission.

court had the authority to order him reinstated with back pay and benefits.

The issues involve the interpretation of statutes and the application of statutory and case law to the facts of the case. As such, they are questions of law which we review *de novo*, owing no deference to the trial court's conclusions. *Betthauser v. Medical Protective Co.*, 172 Wis. 2d 141, 146, 493 N.W.2d 40, 41 (1992).

Based on our independent review of the issues, we conclude that the board is not immune from suit and that the reclassification of Bahr's position did not extinguish his right to be fired only for cause. We also conclude that the court did not err in ordering reinstatement and back pay.

### III. Facts

The facts are not in dispute. Bahr was hired by the board in 1982 as a research analyst, a position in the classified service. After he completed the required probationary period, Bahr was given a permanent appointment to the classified service. Over the next three years he was promoted three times and his work was consistently rated as "satisfactory."

At the time of his hiring, § 25.16(2), STATS., 1981-82, provided that the board's executive director "shall appoint the employes necessary to perform the duties of the board under the classified service." Section 230.34(1)(a), STATS., governing demotion, suspension, discharge and layoff of state employees, provided at the time—and continues to provide today—that employees with "permanent status" in the classified service "may be removed, suspended . . . discharged . . . or demoted only for just cause."

386

The legislature subsequently amended § 25.16(2), STATS.,[2] to provide as follows: "The executive director shall appoint all [board] employes outside the classified service, except blue collar and clerical employes."

In June 1988, Bahr's supervisor rated his performance as "conditional" and several weeks later recommended to the director that Bahr's employment be terminated. On October 10, 1988, the director sent Bahr a notice stating that his employment would be terminated in thirty days.

Bahr appealed the termination to the Wisconsin Personnel Commission, and the commission dismissed the appeal on grounds that it lacked jurisdiction in the case because Bahr did not have permanent status in class in his current position.[3] Bahr then commenced this action. As indicated, the trial court granted him the relief he sought, and the board appeals.

## IV. Sovereign Immunity

The doctrine of sovereign immunity originates in article IV, section 27 of the Wisconsin Constitution, which states: "The legislature shall direct by law in what manner and in what courts suits may be brought against the state." Under the rule, the state may only be sued upon its express consent; consent to suit may not be implied. *State v. P.G. Miron Constr. Co.*, 175 Wis. 2d 476, 480, 498 N.W.2d 889, 891 (Ct. App. 1993), *rev'd on other grounds,* 181 Wis. 2d 1045, 512 N.W.2d 499 (1994). And, for purposes of the rule, an action

[2] The revised statute went into effect May 17, 1988, pursuant to 1987 Wis. Act 399, § 97.

[3] Under §§ 230.45(1)(a) and 230.44(1)(c), STATS., the personnel commission's jurisdiction is limited to appeals by persons who have permanent status in class.

against a state agency or board is an action against the state. *Metzger v. Department of Taxation*, 35 Wis. 2d 119, 131-32, 150 N.W.2d 431, 437-38 (1967).

It is well recognized that the state waives its sovereign immunity from suit when it creates an agency as an "independent going concern," one with "independent proprietary powers and functions." *Lister v. Board of Regents of the Univ. of Wis. Sys.*, 72 Wis. 2d 282, 292, 240 N.W.2d 610, 618 (1976). Whether an agency is an independent going concern, of course, depends on the statutes establishing its powers. *See id.* at 292-93, 240 N.W.2d at 618. In *Lister*, the supreme court held that the Board of Regents of the University of Wisconsin System was not such a "going concern" because:

> Under the provisions of [the applicable statutes] the board was not empowered to incur any debt and the state treasurer was to have charge of "all moneys belonging to the university or in any wise appropriated by law to its endowment or support." Sec. 36.03(3), Stats. 1969. In addition, the treasurer was to pay moneys out "only upon the warrant of the department of administration as provided by law." It is clear from these provisions that at the time this dispute arose ... the Board ... enjoyed [insufficient] autonomy .... [And] the ... action constituted a suit against the state and was therefore subject to the defense of sovereign immunity.

*Id.* at 293, 240 N.W.2d at 618.

In *Majerus v. Milwaukee County*, 39 Wis. 2d 311, 159 N.W.2d 86 (1968), the court considered whether the statutes governing the Wisconsin State Armory Board were such as to render it an "independent going concern," making it ineligible to claim the defense of sovereign immunity. Considering those statutes, the

court held that the board was such an independent body:

> The Armory Board has power to convey real estate and dispose of personal property without express authority from the state. It has the power to hold and disburse its own funds independent of state warrants. It is given no appropriation but has the power to borrow money and issue and sell bonds and other evidences of indebtedness to accomplish its purposes. The debts thus created are satisfied out of rents and interest the Armory Board receives from the property it acquires.

*Id.* at 314-15, 159 N.W.2d at 87.

The armory board argued it should not be considered an independent going concern because it lacked the power to raise money by taxation, held the property it acquired in trust for the state and, further, was "created to perform only certain specific administrative duties and . . . ha[d] no undedicated property out of which an execution c[ould] be satisfied." *Majerus*, 39 Wis. 2d at 315, 159 N.W.2d at 87. The court rejected the argument, noting that the statutes gave the board "a very distinct character" because they stated that the board was created as "a body politic and corporate" with the power "to sue and be sued." These statutes, together with those prescribing its powers, were held to render the board *sui juris* and thus subject to suit. *Id.* at 315, 159 N.W.2d at 87-88.[4]

Here, the investment board emphasizes that, while it also has the power to sue and be sued, it is designated only as a "body corporate," not both a "body

---

[4] The court also noted that subsequent legislation attaching the board to a state department for administrative purposes did not alter its independent status. *Majerus v. Milwaukee County*, 39 Wis. 2d 311, 315, 159 N.W.2d 86, 88 (1968).

*politic and* corporate," as was the armory board in *Majerus*. The board points to language in the *Majerus* opinion stating that, as a body politic and corporate, the armory board was "almost unique." *Majerus*, 39 Wis. 2d at 315, 159 N.W.2d at 88. And the board characterizes that language as "distinguishing" the armory board from the investment board and other state agencies which, in the statutes empowering them to sue and be sued, are designated solely as "bodies corporate." We disagree.

In context, the *Majerus* court's discussion was as follows:

> The Armory Board . . . is given a very distinct character. . . . While some state boards are created a body corporate with the power to sue and be sued, other bodies corporate do not have the right to sue or be sued. Some agencies are not separate corporate bodies but they may sue and be sued. Other divisions of the state government have neither corporate status nor authority to sue or be sued. The Armory Board is almost unique in being designated a body politic and corporate. This with its independent proprietary powers constitutes it *sui juris*.

*Majerus*, 39 Wis. 2d at 315, 159 N.W.2d at 87-88. The court neither states nor holds that, in order for a legislative pronouncement that a given agency may sue and be sued to mean what it says, the agency must not only be designated as a "body corporate" but also be designated as a "body politic."

The board also points to our decision in *Lindas v. Cady*, 142 Wis. 2d 857, 419 N.W.2d 345 (Ct. App. 1987), *rev'd on other grounds*, 150 Wis. 2d 421, 441 N.W.2d 705 (1989), as holding that the existence of a statute authorizing an agency "to sue and be sued" does not waive sovereign immunity. *Lindas* involved an action

by a fired state employee against the Wisconsin Department of Health and Social Services (DHSS) based on the federal civil rights act, 42 U.S.C. § 1983 and Title VII. We held that, although the statute under which DHSS operated authorized it to "sue and be sued," such authorization "[did] not amount to a consent to be sued in sec. 1983 or other civil rights actions" because the statute "was created . . . at a time when Wisconsin enjoyed governmental immunity from tort suits." *Lindas*, 142 Wis. 2d at 861, 419 N.W.2d at 347.[5] That immunity was subsequently abrogated by the supreme court in 1962 in *Holytz v. City of Milwaukee*, 17 Wis. 2d 26, 115 N.W.2d 618 (1962). Our decision in *Lindas* was based on a 1969 case, *Townsend v. Wisconsin Desert Horse Ass'n*, 42 Wis. 2d 414, 167 N.W.2d 425 (1969), where the supreme court held that a statute allowing claims against the state to proceed upon the filing of a $1,000 bond did not apply to tort claims because, at the time the legislature passed the statute, the state was not subject to tort liability.

> We think all that the legislature had in mind at the time it passed the [statute] was to consent to be sued in cases only where there then existed a liabil-

----

[5] The supreme court concluded that Lindas's § 1983 claim was barred because DHSS is not a "person" subject to suit under § 1983. *Lindas v. Cady*, 150 Wis. 2d 421, 431, 441 N.W.2d 705, 709 (1989). The court went on to hold, however, that Lindas's Title VII claim was not barred by state sovereign immunity because "congress, in enacting Title VII . . . intended to override . . . the immunity that states would claim in actions against them in their own courts." *Id.* at 430, 441 N.W.2d at 709. Because the court found that "Congress intended that states would be defendants to Title VII actions," it concluded that Lindas's Title VII claim could proceed. *Id.* at 429-30, 441 N.W.2d at 709.

ity for the claim, and it is a little late in the day for this court now to say that the legislature also intended to include a consent to be sued for tort claims if this court at sometime in the future reversed itself and abolished governmental tort immunity. We cannot now put meaning into this section as a consent to be sued because *Holytz* . . . has removed the defense of tort immunity.

*Id.* at 420-21, 167 N.W.2d at 428. Based on that statement in *Townsend*, our conclusion in *Lindas* was simply: "We think the same reasoning applies to [the statute authorizing DHSS to sue and be sued]." *Lindas*, 142 Wis. 2d at 862, 419 N.W.2d at 347.

Unlike *Townsend*, this is not a tort action. Bahr seeks only declaratory relief: reinstatement to a state position on grounds that the agency failed to follow the applicable statutes when it terminated his employment.[6] No *Townsend*-type argument is before us in this case, and we do not consider *Lindas* as stating a blanket rule that legislative consent for an agency to sue

---

[6] We recognize that Bahr's action seeks back pay in addition to reinstatement. And while we find no Wisconsin authority classifying back pay as either a damage claim or an equitable remedy in the context of a sovereign immunity defense, we note that in job reinstatement cases under Title VII of the Civil Rights Act it is generally held that "an award of back pay is an integral part of the equitable remedy of reinstatement" and thus does not invoke the right to a jury trial. *Grayson v. Wickes Corp.*, 607 F.2d 1194, 1196 (7th Cir. 1979), and *see* cases cited therein. We hold in this case that Bahr was improperly terminated from his employment because the board did not follow the required procedures in failing to renew his contract. Under those circumstances, back pay is a necessary component of restoring him to the status he occupied before the board's improper actions deprived him of a protected right. It is an integral part of his equitable reinstatement claim.

and be sued cannot be considered a waiver of sovereign immunity.[7]

Indeed, the United States Supreme Court recently considered the effect of a similar statute on a sovereign immunity defense raised by the Federal Savings and Loan Insurance Corporation to a lawsuit filed by an employee of a savings and loan association whose employment was terminated when the FSLIC was appointed as the association's receiver. *Federal Deposit Ins. Corp. v. Meyer*, 114 S. Ct. 996, (1994). The act creating the FSLIC empowered the agency "to sue and be sued, complain and defend, in any court of competent jurisdiction," *id.* at 1000, and the Court held that this legislative declaration served to waive the agency's immunity: "[The statute's] terms are simple and broad . . . . [And] we have recognized that such sue-and-be-sued waivers are to be 'liberally construed,' notwithstanding the general rule that waivers of · sovereign immunity are to be read narrowly in favor of the sovereign." *Id.* at 1003 (citations omitted).

The Court went on to quote from *Federal Hous. Admin. v. Burr*, 309 U.S. 242 (1940), that sue-and-be-sued clauses cannot be limited by implication unless there has been a

> "clea[r] show[ing] that certain types of suits are not consistent with the statutory or constitutional scheme, that an implied restriction of the general authority is necessary to avoid grave interference

---

[7] We note in this regard that in *Majerus* the supreme court held that the armory board was an independent going concern and thus not entitled to claim sovereign immunity despite the fact that the plaintiff sued in tort for personal injuries alleged to have been suffered while working on property leased to the board. *Majerus*, 39 Wis. 2d at 312-13, 159 N.W.2d at 86.

with the performance of a governmental function, or that for other reasons it was plainly the purpose of Congress to use the 'sue and be sued' clause in a narrow sense."

*Meyer,* 114 S. Ct. at 1003 (quoting *Burr,* 309 U.S. at 245). The *Meyer* Court held that, absent such a showing, agencies " 'authorized to "sue and be sued" are presumed to have fully waived immunity.' " *Id.* (quoting *International Primate Protection League v. Administrators of Tulane Educ. Fund,* 500 U.S. 72, 86 n.8 (1991)).

■

While we realize that decisions of the United States Supreme Court do not bind our interpretation of the Wisconsin Constitution and statutes, we find the Court's reasoning persuasive on the point. We presume that the legislature means what it says, *State ex rel. Frederick v. McCaughtry,* 173 Wis. 2d 222, 226, 496 N.W.2d 177, 179 (Ct. App. 1992), and there is nothing in the legislature's grant of authority to the investment board that would indicate that its authorization of suits against the board should be read as anything other than a waiver of the board's immunity from suit.

We also recognize that in *Majerus* the Wisconsin Supreme Court considered the armory board's grant of authority to sue and be sued in light of its "independent proprietary powers" in concluding that the board was not subject to sovereign immunity. We thus consider Bahr's argument that the statutes governing the operations of the investment board provide the necessary nexus and the board's argument that they do not.

The board, relying on the *Majerus* court's summary of the powers of the armory board, which we have

394

quoted above,[8] maintains that because it has none of those powers it cannot be considered an "independent going concern."

But *Majerus* is not a checklist which, unless each item is ticked, requires the conclusion that the agency is immune. Indeed, the *Majerus* court itself was faced with a similar argument. The armory board argued that, because it did not have all of the proprietary powers considered by the court in an earlier case to be indicative of an "independent going concern," *see Sullivan v. Board of Regents of Normal Schs.*, 209 Wis. 242, 244 N.W. 563 (1932), it should partake in the sovereign's immunity. The *Majerus* court, however, recognized that the factors considered in *Sullivan* were not exclusive, but a search for the legislature's intent, and declined to rule that, in order to be an independent concern, "the agency must have all the independent proprietary functions or powers enumerated in *Sullivan*." *Majerus*, 39 Wis. 2d at 314, 159 N.W.2d at 87. We think the same is true here, and we turn to a consideration of the statutory powers of the investment board.

Under the applicable statutes, the board has the responsibility of "managing the securities" of most of the state's investment funds. Section 25.14(1), STATS. Its purpose is "to provide professional investment management of trusts, operating funds and capital funds

---

[8] Briefly, the *Majerus* court emphasized the armory board's power to hold and disburse funds "independent of state warrants," and the fact that it received no appropriations from the legislature but rather had the power to borrow money and sell bonds "to accomplish its purposes," and to satisfy those debts out of the rents and interest received from the property it acquires. *Majerus*, 39 Wis. 2d at 314-15, 159 N.W.2d at 87.

established by law," and, significantly we think, the legislature has expressly declared its "intent . . . that the board be *an independent agency of the state* which is to manage money and property for the state, its agencies and trust funds," with the goal of "accomplishing the purpose of each trust or fund." Section 25.15(1), STATS. (emphasis added). The board is directed to "invest, sell, reinvest and collect income and rents" in a reasonable and prudent manner, and members of the board constitute its governing body, with the authority to "promulgate rules and formulate policies deemed necessary and appropriate to carry out its functions." Sections 25.15(2) and 25.156(1), STATS.

As indicated above, § 25.17(1), STATS., provides that the board "shall be a body corporate with power to sue and be sued in [its] name" and grants to it the "exclusive control of the investment and collection of the principal and interest of all moneys loaned or invested from" a list of forty-one named funds. Section 25.18(1)(a), STATS., authorizes the board to employ special counsel "in any matters arising out of the scope of its investment authority," with the expenses to be paid out of current income of the fund for which the services are furnished. Other subsections of § 25.18 authorize the board to execute instruments indemnifying against its failures and losses, to secure insurance against any risks relating to its functions, to liquidate any corporation in which it owns 100% of the stock, to sell stock and engage in a variety of financial and stock transactions, and to employ contractors or other agents "necessary to evaluate or operate any property" in which it or a fund it manages has an interest.

Significantly, § 25.18(1)(f), STATS., authorizes the board to own, maintain and repair buildings or other structures or premises on its own, expressly exempting

396

it from the provisions of ch. 16, STATS., reposing all state purchasing, contracting and building responsibilities in the department of administration. In each instance, the expenses incurred in the exercise of these powers are to be paid by the board out of the current income of the particular fund for which the action is taken; no state-appropriated funds are involved.

The board argues that Bahr confuses the "statutory distinction" between its operating budget and the funds it is entrusted to invest on behalf of the several funds it administers. As evidence that the board is not the type of independent concern the foregoing statutes would appear to indicate, the board refers us first to ch. 16, STATS., the chapter dealing with the department of administration and its budget and other responsibilities. It asserts that § 16.002(2), STATS., defines the board as a "department" and that § 16.50(1), STATS., requires it to submit a "budget estimate" to DOA for approval, suggesting that in this respect it is no different from all other arms and agencies of the state.

We acknowledge the sweeping provisions of § 16.002(2), STATS., which defines "departments" as "constitutional offices, departments and independent agencies and includes all societies, associations and other agencies of state government for which appropriations are made by law." We also acknowledge that § 16.50(1), STATS., requires "[e]ach department except the legislature and the courts" to prepare and submit budget estimates to DOA. Where we part company with the board is over its concluding assertion: "The Legislature appropriates . . . state funds [to the board] for its operations." The cited authority for the proposition is § 20.536(1)(k), STATS., which, while it does indicate an "appropriation" to the board for "investing the funds," also indicates that the board's operations

are funded by its own program, billing "the state agencies for whom investments are made" and, every six months, "reconcil[ing] its accounts and report[ing] to each state agency its share of total expenses for the year." It thus appears that no general purpose revenues are allocated to the board, and that its operations are funded by its own program revenues.

Finally, the board argues that because the state treasurer "acts as treasurer of [the board]" and as custodian of "the state funds belonging to the Board" under §§ 25.19 and 14.58(1), STATS.—and because the treasurer can pay funds out of the treasury only upon DOA warrants—the board cannot be considered an "independent going concern" because, unlike the armory board in *Majerus*, it does not have the power to "hold and disburse its own funds independent of state warrants." *Majerus*, 39 Wis. 2d at 314, 159 N.W.2d at 87. Again, we disagree.

The state treasurer is, as the board suggests, the treasurer of the investment board under § 25.19(1), STATS. However, the statute also permits either the treasurer *or the board* to deposit any of the securities purchased by the board in "vaults or other safe depositories outside of the office of the state treasurer, and either in or outside of this state . . . ." We thus consider the statute as providing little support for the board's argument. It also is true that one of the duties of the state treasurer is to "[r]eceive and have charge of all moneys paid into the treasury and any other moneys received by officers and employes of state agencies . . . ." Section 14.58(1), STATS. Again, in light of the other indicia of independence found in the statutes discussed above, we do not believe this fact compels the result sought by the board on this appeal.

The investment board not only is specifically authorized "to sue and be sued in [its own] name," but the legislature has expressly stated its "intent . . . that the board be an independent agency of the state . . . ." Sections 25.17 and 25.15(1), STATS. Whether considered by itself or in light of the other powers granted to the board by statute—which include broad authority to manage and invest, sell, reinvest and collect income and rents, to employ outside counsel and contractors, and to acquire, manage and sell real estate without DOA participation—that language satisfies us that the board is indeed the type of "independent going concern" long held to be ineligible to raise the defense of sovereign immunity.[9]

---

[9] The board points to the following language in *Lister* in support of its argument that Bahr's action is barred by principles of sovereign immunity:

> A judgment in plaintiffs' favor . . . for a refund (of out-of-state tuition) would require payment of moneys in the hands of the state treasurer over which the Board of Regents has no independent control. To this extent the plaintiffs' action constituted a suit against the state and was therefore subject to the defense of sovereign immunity.

*Lister v. Board of Regents of the Univ. of Wis. Sys.*, 72 Wis. 2d 282, 293, 240 N.W.2d 610, 618 (1976).

The *Lister* court did not explain the significance of the statement, and we have found no other case indicating that the source of the funds, in and of itself, determines whether sovereign immunity applies to a given agency. Indeed, if the court was stating such a rule, its preceding discussion of the powers of the board of regents would have been superfluous and irrelevant. In addition, the plaintiffs in *Lister* were suing to recover specific dollar amounts from the state—the difference between resident and nonresident tuition at the University of Wisconsin Law School—and we acknowledge that the board is trustee for

## V. The Position Reclassification

As indicated, the trial court ruled that Bahr retained a property interest in his employment with the board that survived the reallocation of board employee positions to the unclassified service. Thus, the court concluded that Bahr's termination required a showing of cause.

There is no question that Bahr had a property interest in his position prior to adoption of the statute moving all nonclerical and nonblue-collar board positions from the classified to the unclassified service. *See State ex rel. DeLuca v. Common Council*, 72 Wis. 2d 672, 678, 242 N.W.2d 689, 693 (1976) (statutory provision that governmental employee could be fired only for cause recognized as creating a "property interest . . . in . . . employment"). Bahr does not challenge the "prospective" application of the law—to persons appointed to those positions after its passage—only its "retroactive" application to his employment.

The board argues first that, because there were no classified positions at the board (other than blue collar and clerical) after the amendment, we must consider Bahr and all other employees similarly situated to

the employee funds it administers and cannot be required to pay money judgments from those funds. Bahr, however, seeks only the previously-designated salary he lost due to what he claims was the illegal termination of his employment.

Finally, as we have noted above, the supreme court held in *Majerus* that the armory board was an independent going concern not entitled to the defense of sovereign immunity even though the plaintiff in that case was seeking to recover a money judgment for personal injuries suffered while working on premises leased to the board. *Majerus*, 39 Wis. 2d at 312-13, 159 N.W.2d at 86.

have been "appointed" to the unclassified positions when they showed up for work on the day the amendment became effective. There is no evidence of such wholesale appointments in this case, and the amendment does not indicate that the employees are to be considered appointed or reappointed on the law's effective date.

The board also maintains that Bahr can have no property rights in the position that would entitle him to be terminated only for cause because the statute providing that right grants it only to employees "with permanent status in class *in the classified service . . . .*" Section 230.34(1)(a) and (ar), STATS. (emphasis added). Thus, says the board, because at the time of his firing his position had been reallocated to the unclassified service, he was no longer a "classified" employee and could be fired at will and without cause. We believe *Castelaz v. City of Milwaukee*, 94 Wis. 2d 513, 289 N.W.2d 259 (1980), *overruled on other grounds by Casteel v. Vaade*, 167 Wis. 2d 1, 21 n.18, 481 N.W.2d 476, 484 (1992), requires rejection of the argument.

Donald Castelaz was appointed to a civil service position in the federally funded Milwaukee Model Cities Agency. As in state service, city civil service employees could be fired only for cause. A few years later, when the agency was undergoing a reduction in funding and apparently had implemented a "layoff plan,"[10] Castelaz was fired. He argued that, because he was hired to a civil service position, he could not be fired without a hearing and without being provided the other job protections specified in the city's civil service ordinance. *Castelaz*, 94 Wis. 2d at 518, 289 N.W.2d at 261. The city argued that Castelaz's position was listed

---

[10] The court's opinion does not describe the plan.

401

in the ordinances as an "exempt position"—just as "unclassified" positions are listed in § 230.08, STATS.—which did not carry civil service job protections and, further, that his job rights extended only for the duration of the agency's federal funding. *Id.* at 520-21, 289 N.W.2d at 262.

The supreme court agreed that "[e]mployment under the civil service laws is not an absolute job guarantee," and that "[i]f there are no funds available, or if the position is abolished in good faith or otherwise becomes unnecessary, there is nothing to prevent the termination of civil service employees." *Castelaz*, 94 Wis. 2d at 521, 289 N.W.2d at 262. However, the court rejected the city's argument that people holding exempt positions can be removed in the agency's discretion "even when the exempt position[s are] filled by . . . civil service employee[s]," stating:

> When an exempt position is filled by a civil service employee he [or she] is entitled to the protection of the substantive as well as the procedural rights conferred by those rules. Although the statute refers to exempt and classified positions it must be kept in mind that the civil service laws were designed to protect employees and not positions. . . .
>
> Once an employee achieves full civil service employment status, he [or she] is entitled to the protection of the civil service laws. The purpose of providing exempt positions in city employment is to allow more flexibility than the civil service system provides in filling those positions. But once the decision is made to place a civil service employee in an otherwise exempt position, a determination must have been made by the hiring authority that the position is one which is compatible with the civil service laws. When a civil service employee occupies an exempt position he cannot be laid off, removed,

discharged or reduced for reasons which would be in violation of the statute and rules. Likewise, he [or she] is entitled to the procedural protection of the rules.

*Id.* at 521-22, 289 N.W.2d at 263 (citations omitted).

We see no appreciable difference between Bahr's situation and Castelaz's. While the supreme court in *Castelaz* stated at one point that it was unnecessary to determine whether Castelaz was filling an exempt position, *Castelaz*, 94 Wis. 2d at 520, 289 N.W.2d at 262, as the above language illustrates, the court went on to decide the case as if he had been. And when the court "takes up, discusses, and decides a question germane to, but not necessarily decisive of, the controversy, such decision is not a *dictum* but is a judicial act of the court which it will thereafter recognize as a binding decision." *State v. Kruse,* 101 Wis. 2d 387, 392, 305 N.W.2d 85, 88 (1981) (quoting *Chase v. American Cartage,* 176 Wis. 235, 238, 186 N.W. 598, 599 (1922)).

Both Bahr and Castelaz were hired as civil servants. The only difference is that Castelaz was hired (as a civil servant) to fill an exempt position—in state terms, an "unclassified" position—whereas in Bahr's case, his position was reallocated to the unclassified service several years after he was hired and achieved permanent status in the classified service. We see nothing in that distinction that would render the discussion and holding in *Castelaz* inapplicable to this case.

The board argues that to so hold here would be to countenance an absurd result: it would give state employees an "absolute job guarantee." That is not so.

All we hold in this case is that, under the circumstances before us, Bahr cannot be fired without the procedural process specified by statute for classified state employees. The same was true in *Castelaz*, where the court expressly stated, as we have noted above, that civil service employment is "*not* an absolute job guarantee." *Castelaz*, 94 Wis. 2d at 521, 289 N.W.2d at 262 (emphasis added). Civil service employees may be terminated for cause, or for other specified reasons, pursuant to the procedures stated in the civil service laws. Such reasons include "a reduction in force due to a stoppage or lack of work or funds or owing to material changes in duties or organization . . . ." Section 230.34(2), STATS. *See State ex rel. Thein v. City of Milwaukee*, 229 Wis. 12, 18, 281 N.W. 653, 656 (1938), where the supreme court recognized:

> Civil-service laws are not intended to prevent good-faith reorganization with a view to securing greater efficiency. [They] are not to be evaded by a sham abolition of an old position for the purpose of ousting an incumbent, but on the other hand the civil-service laws are not intended to interfere with . . . combining the duties of one civil-service position with those of another, even though this results in some persons being dropped from the service.

The board argues, relying on *DHSS v. State Personnel Bd.*, 84 Wis. 2d 675, 267 N.W.2d 644 (1978), that Bahr's rights with respect to his termination are dependent on his *post*amendment status, not on his *pre*amendment position. The board asserts that, according to *DHSS*, "the important status is the status of the position 'in which the employe is then serving, not a position in which he has served in the past,' " and concludes: "Thus, the employe's rights are defined by the status of the position he holds at the time of dis-

charge, not whether the employe had classified status in a former position."

The employee in *DHSS* had worked in a civil service position at the University of Wisconsin for several years and was then appointed to a different position—also in the classified service—at the Department of Health and Social Services. While serving the required probationary period in the new position, he was fired for, among other things, performance shortcomings, failure to follow directions and tardiness. *DHSS*, 84 Wis. 2d at 679, 267 N.W.2d at 646. He appealed to the personnel board, claiming that he had been fired for other than just cause, and the board agreed. The circuit court reversed, and the issue on appeal was whether the personnel board had jurisdiction to hear the employee's appeal, inasmuch as its jurisdiction was limited to appeals by civil service employees: "employes with permanent status in class." *Id.* at 680, 267 N.W.2d at 646.

The supreme court ruled that, because the employee was still serving a probationary period under the civil service laws, he did not have "permanent status in class," and thus the board lacked jurisdiction to hear his appeal. *DHSS*, 84 Wis. 2d at 681, 267 N.W.2d at 647. In so ruling, the court rejected the board's argument that the employee had "tenure rights based on his old position" and thus "could only be discharged with[ ] cause from his new position . . . ." *Id.* Considering the personnel board rule defining "permanent status in class" in terms of an employee who has "served a qualifying [or probationary] period," the court concluded that the rule "requires that status in class relate to a class in which the employe is then serving, not a position in which he has served in the past." *Id.* at 682, 267

N.W.2d at 647. The latter quotation is the source of the investment board's argument.

*DHSS* does not advance the board's argument. First, the *DHSS* court was considering a particular procedural rule of the personnel board, and the comments just quoted were directed to the effect of that rule—a rule that is not before us on this appeal. Second, the employee in *DHSS* changed jobs. He left his position at the university and began a new job at the department; as indicated, he was fired while still on probation in the new position. Because he had not yet passed the probationary period to attain civil service status in the new position, he attempted to "pull" the protections of his former job with him, and the supreme court properly rejected that argument. In this case, Bahr changed neither jobs nor agencies.

Finally, the board points to two other instances in which the legislature transferred positions from the classified to the unclassified service and, in doing so, expressly made some or all of the transferred positions subject to various "civil service" protections, including termination-for-cause requirements.[11] It argues that, if the legislature had intended the same result for

---

[11] In 1977, all division administrator positions were transferred from the classified service into the unclassified service, with certain specified rights reserved to incumbent administrators who might be subsequently terminated for reasons other than just cause. Section 230.335, STATS. A 1981 law made a similar transfer of positions in the legislative audit bureau, specifically stating that the employees in the positions were to retain, while continuing to work for the bureau, "those protections afforded employes in the classified service . . . ." Section 13.94(5), STATS.

employees of the investment board, it could have said so when it passed the law reallocating the positions to the unclassified service. It is an arguable point, but we do not believe it overcomes the supreme court's holding in *Castelaz*.

## VI.  The Remedy

The board argues that, if we are to sustain Bahr's claims, as we do, he is not entitled to reinstatement but only to "the process which was due" under the statutes. The board does not explain what that "process" is, however. All it suggests is that he is entitled to no more than "declaratory relief as to whether he had a property interest in his . . . position and whether his procedural rights were denied."

As we have pointed out earlier in this opinion, under § 230.34(1)(a), STATS., Bahr could be removed from his position "only for just cause," and §§ 230.44(1) and 230.87, STATS., give him the right to appeal and seek judicial review of any such decision. Since the board's action denied him those rights, we believe the trial court properly ordered that he be reinstated to the position with back pay. Nothing short of that will restore the . *status quo*. Then, if the board wishes to proceed to termination in compliance with ch. 230, STATS., it may do so.

In *DeLuca*, the supreme court considered § 17.16, STATS., which provided that municipal officers could be removed only for "cause," and held that the statute conferred upon the plaintiff-employee a "property interest . . . in his employment." *DeLuca*, 72 Wis. 2d at 677-78, 242 N.W.2d at 692-93. Section 230.34(1)(a), STATS., which gives similar rights to Bahr, cannot be interpreted any differently. We agree with Bahr that, if

an employee entitled to the rights afforded by law to employees in the classified service can be fired in violation of that law, but cannot be reinstated and otherwise restored to the *status quo* in order to reap the law's benefits, the civil service system will indeed be "turned on its head."

*By the Court.*—Judgment affirmed.