Amy L. WALKER, Plaintiff-Appellant,

TRANSPORTATION INSURANCE COMPANY, Plaintiff,

v.

UNIVERSITY OF WISCONSIN HOSPITALS, properly known
as the Board of Regents of the University of Wisconsin
System, Julie Swedarsky, Elaine Snyder, Laurie
Losenegger, Dr. Mark Moffet, Dr. Greg Dodge, Dr.
Victoria Shampaine, Mary Ann Bird Roelke and John
or Jane Doe, Defendants-Respondents.

Court of Appeals

*No. 94–3403. Submitted on briefs September 8, 1995.—
Decided November 22, 1995.*

(Also reported in 542 N.W.2d 207.)

238

For the plaintiff-appellant the cause was submitted on the briefs of *Douglas W. Kammer* of *Kammer Law Office, Chartered,* of Portage.

For the defendants-respondents the cause was submitted on the brief of *James E. Doyle,* attorney general, and *Steven D. Ebert,* assistant attorney general.

Before Eich, C.J., Gartzke, P.J., and Sundby, J.

EICH, C.J. Amy L. Walker, a nurse's aide working at University of Wisconsin Hospitals,[1] was injured when a patient she was attending became violent and assaulted her. She sued the hospital, the University of Wisconsin Board of Regents and various hospital employees for money damages claiming, among other things, that Mary Ann Roelke, an occupational therapist employed by the hospital, was negligent in the manner in which she applied physical restraints to the patient.[2]

---

[1] Walker was employed by a private company, Norrell Health Care, an independent contractor engaged in the business of providing health care workers to several hospitals and clinics in the Madison area, including University Hospitals.

[2] Walker also sued several physicians and other hospital employees. While her appeal is from the judgment dismissing the action against all defendants, her argument on appeal centers on Roelke alone.

The trial court granted summary judgment dismissing the action, concluding: (1) the hospital, as an arm or agency of the state, was entitled to sovereign immunity; (2) Roelke, as a state employee acting within the scope of her employment, was also immune from suit under the doctrine of "public employee immunity," as discussed in several opinions of the supreme court and this court.

We conclude that the trial court properly dismissed the action against the hospital and the board of regents, but that it erred in granting summary judgment dismissing Walker's action against Roelke. We therefore affirm in part and reverse in part and remand to the trial court for further proceedings.

The facts are not in dispute. Walker was assigned to "sit" with a patient, Gerald Brainard, on November 7, 11 and 12, 1991. Brainard was a liver-transplant patient who had returned to the hospital a year after his surgery. He was alleged to have a history of behavioral and brain disorders which was known to hospital personnel.

When Walker began sitting with Brainard he was in restraints in his bed and was not lucid. And while the first two days of her assignment were otherwise uneventful, Walker did note that Brainard was loud and "extremely uncooperative" and that on more than one occasion he was able to free his arms from their restraints, throwing things around the room and pulling items from tables and carts.

During Walker's shift on November 12, Roelke came to Brainard's room to exercise his limbs. She released his arms and legs from the restraints and when he became uncooperative, she discontinued the exercises, reattached the restraints and left the room.

Sometime thereafter Brainard asked Walker for a glass of water and when she approached his bed he freed his hands, grasped Walker and began punching her in the head. She claimed in her lawsuit that she had not been told that Brainard was dangerous and combative, despite the hospital's knowledge of these facts. Other facts will be discussed below.

## I. Sovereign Immunity

Sovereign immunity in Wisconsin derives from Article IV, Section 27, of the Wisconsin Constitution, which provides, "The legislature shall direct by law in what manner and in what courts suits may be brought against the state," and which has been interpreted to require that the state must expressly consent to be sued. *Busse v. Dane County Regional Planning Comm'n*, 181 Wis. 2d 527, 534, 511 N.W.2d 356, 359 (Ct. App. 1993).[3] As a general rule, the state's immunity extends to its arms and agencies, although we have recognized that the legislature may create an agency with such an array of " 'independent proprietary powers or functions' " that it becomes *sui juris*—" 'sufficiently independent of the state to be sued as such' "—and that when this occurs, the state has waived its sovereign immunity with respect to the agency. *Id.* at 534, 511 N.W.2d at 359 (quoting *Kegonsa Joint Sanitary Dist. v. City of Stoughton*, 87 Wis. 2d 131, 143-44, 274 N.W.2d 598, 604 (1979)).

---

[3] The state's consent may not be implied: " '[I]n the absence of express legislative authorization the state may not be subjected to suit.' " *Busse v. Dane County Regional Planning Comm'n*, 181 Wis. 2d 527, 535-36, 511 N.W.2d 356, 359 (Ct. App. 1993) (quoted source omitted).

█ There is no question that the board of regents is an arm or agency of the state for sovereign immunity purposes. *Lister v. Board of Regents*, 72 Wis. 2d 282, 292-93, 240 N.W.2d 610, 618 (1976). Walker argues, however, that University Hospitals, even though it is an entity "establish[ed] by regents as directed in § 36.25(13), STATS.," is not. Citing *Majerus v. Milwaukee County*, 39 Wis. 2d 311, 159 N.W.2d 86 (1968), one of the leading cases on the "independent-going-concern" exception to the rule of sovereign immunity, Walker maintains that the hospital is just such an entity and thus may not be considered an arm or agency of the state for purposes of the rule.

The question in *Majerus* was whether the Wisconsin State Armory Board was ineligible to claim sovereign immunity. In order to resolve the issue, the supreme court looked to the board's statutory designation and powers, which included: (1) its designation as a " 'body politic and corporate' "; (2) its statutory authorization "to sue and be sued" in its own name; (3) its power to "convey real estate and dispose of personal property without express authority from the state"; (4) its power to "hold and disburse its own funds independent of state warrants"; (5) its power to "borrow money and issue and sell bonds and other evidences of indebtedness to accomplish its purposes"; and (6) its ability to pay its debts out of rents and interest received from its acquired property. *Id.* at 314-15, 159 N.W.2d at 87-88 (quoted source omitted). The court concluded that such a plethora of powers rendered the board *sui juris*, and thus ineligible to assert the defense of sovereign immunity. *Id.* at 315, 159 N.W.2d at 87-88.

The hospital was established by the UW Board of Regents under § 36.25(13), STATS., for the purpose of

delivering health care, instructing medical students and other health professionals, supporting health care research and providing assistance to health care programs and personnel throughout the state. Unlike the armory board, the hospital is not designated as a "body politic and corporate," and it possesses neither the express power to sue and be sued nor any statutory authority to borrow money.[4] All hospital leases and purchases of equipment, goods and services are subject to state-directed bidding procedures and other rules applicable to other state agencies, as are its personnel and budgeting decisions.

---

[4] Walker asserts in her brief that the hospital has "the [independent] power to borrow money, and has borrowed large sums for building purposes." She points to no statutory authority for the assertion, but instead refers us to the deposition of Peter Christman, a hospital financial officer. Christman's testimony, however, was simply that the construction of the hospital in 1979 and several subsequent additions were financed "with hospital funds either through . . . direct payment" or "by . . . state obligation bonds." Indeed, Christman stated that two-thirds of the original hospital construction was financed by state obligation bonds. Walker has not satisfied us that the hospital has either actual or implied authority to borrow funds independent of the State of Wisconsin.

As to the statutory power to sue and be sued, in *Bahr v. State Inv. Bd.*, 186 Wis. 2d 379, 394, 521 N.W.2d 152, 157 (Ct. App. 1994), we emphasized the importance of such authority, stating that "there is nothing in the legislature's grant of authority to the investment board that would indicate that its authorization of suits against the board should be read as anything other than a waiver of the board's immunity from suit." We think the absence of such a clause in the statutes designating and empowering the hospital is of equal significance in arriving at our conclusion in this case that immunity attaches.

■
Additionally, both the supreme court and this court have recognized that a primary test for sovereign immunity is "whether a judgment for the plaintiffs on their claims . . . would require payment from state funds." If so, the action is barred. *Lister v. Board of Regents*, 72 Wis. 2d at 292, 240 N.W.2d at 617; *see Grall v. Bugher*, 181 Wis. 2d 163, 168, 511 N.W.2d 336, 338 (Ct. App. 1993), *rev'd on other grounds*, 193 Wis. 2d 65, 532 N.W.2d 122 (1995). Walker argues that any judgment against the hospital in this case would not implicate state funds because the hospital obtains liability coverage through its participation in a state "risk pool." She infers that because the hospital contributes money from its revenues to the pool, and because the pool is used to pay claims, no "state funds" would be used to pay any judgment she may obtain against the hospital. The record, however, provides no support for the inference. The state risk management director stated in his deposition that any judgments taken against the hospital would be paid from the state treasury under § 20.865(1), STATS.[5] According to the director, "The appropriation from the state treasury made in sec. 20.865(1), Wis. Stats., is the only source of funds available to pay a judgment against any of the defendants in this lawsuit."

Even so, Walker maintains that other facts establish that the hospital is, like the armory board in *Majerus*, an independent agency which does not share

---

[5] Section 20.865(1)(fm), STATS., appropriates from general state funds "[a] sum sufficient to supplement the appropriations of state agencies . . . to pay for state liability arising from judgments and settlements . . . ."

in the state's immunity.[6] She first points to a provision in the bylaws of the hospital's board of trustees giving the board authority to "govern[ ]" the hospital, subject to the authority of the board of regents and the UW president and chancellor. We glean from that provision that the hospital's governance is indeed subject to state control through the regents of the university.

Next, referring generally to a collection of two years' worth of minutes of board meetings, she asserts that "[a] review of the[se] minutes . . . bears out the reality" that the hospital administrator, not the board, runs the hospital, apparently without control of either the hospital board or the board of regents. It is an argument we need not consider in light of the absence of citations to the record for the underlying factual assertions.[7]

Walker next contends that the hospital cannot be considered an arm of the state because, according to

---

[6] Walker does not argue that summary judgment on the sovereign immunity issue was inappropriate because of the existence of disputed material facts but that, as a matter of law, the hospital is an independent entity that does not share the state's immunity.

[7] In *Tam v. Luk*, 154 Wis. 2d 282, 291 n.5, 453 N.W.2d 158, 162 (Ct. App. 1990) (quoted source omitted), we said:

> [W]e decline to embark on our own search of the record, unguided by references and citations to specific testimony, to look for other evidence to support [the factual basis underlying a party's argument]. Section (Rule) 809.19(1)(e), Stats., requires parties' briefs to contain "citations to the . . . parts of the record relied on" and we have held that where a party fails to comply with the rule, "this court will refuse to consider such an argument . . ."

*See also Keplin v. Hardware Mut. Cas. Co.*, 24 Wis. 2d 319, 324, 129 N.W.2d 321, 323 (1964) ("it is not the duty of [the appellate] court to sift and glean the record *in extenso* to find facts which will support an assignment of error").

the deposition testimony of a hospital financial officer, Peter Christman, physicians who work at the hospital are not state employees but rather are "employees" of Affiliated University Physicians (AUP), a private entity with no relationship to the hospital. Christman's testimony, however, was not that the physicians are "employed" by AUP but that AUP's "staff" are not state employees. AUP, according to the affidavit of one of its officials, Clara Scolare, is a nonprofit corporation that provides recordkeeping, billing and collection services to physicians who are faculty members of the UW medical school and who comprise the hospital's medical staff. The faculty physicians practice at the hospital and its clinics through various partnerships organized pursuant to a 1974 agreement between the physicians, the UW administration and the board of regents. And while AUP staff—the employees of the corporation handling the bookkeeping and other tasks for the physicians—are not state employees, Scolare confirmed that "the faculty physicians are employees of the State of Wisconsin."

Walker, pointing to other portions of Christman's deposition, next asserts that the hospital should not be considered a state entity because its "profits" are not paid into the state treasury and that it acquired and equipped a satellite clinic on Madison's west side with hospital revenues. As to the first, Walker correctly restates Christman's testimony as acknowledging that the hospital's profits are generally not paid into the treasury,[8] but are either invested in the hospital capital account or retained for operations—but he also stated that "it's always part of a state fund." Nor do we see anything in the hospital's opening of a satellite

---

[8] He stated at one point, however, that on at least one occasion, some $2.9 million was paid to the treasury.

clinic—which, according to Christman, is run by the hospital and subject to "all the . . . rules and regulations of the institution"—that aids Walker's argument.

The exception to sovereign immunity which is triggered when, *à la Majerus*, the state is said to have created an independent agency with proprietary powers, is a " 'traditionally narrow exception,' " *Busse v. Dane County Regional Planning Comm'n*, 181 Wis. 2d 527, 539, 511 N.W.2d 356, 360 (Ct. App. 1993) (quoted source omitted), and Walker has not persuaded us that it should be applied here.[9] We conclude that the trial

---

[9] Walker also points to portions of a 1993-94 Legislative Audit Bureau report evaluating a proposal to restructure University Hospitals as establishing the lack of "[a]ny relationship between the hospital and the government of Wisconsin." She cites us to the bureau's criticism of the hospital's creation of a separate nonprofit corporation to acquire several private medical practices and their assets in the late 1980's. Some of the bureau's concerns were: (1) some of the funding for these acquisitions came from the hospital; (2) it did not appear that the hospital's board of trustees or the UW Board of Regents had been "fully apprised" of the transaction; and (3) there was a lack of "accountability within the . . . network," which should be remedied by creating a new entity to permit the hospital to operate and expand in the future.

As the audit bureau report acknowledges, "Construction, purchase, or leasing of [hospital] facilities is subject to the review and approval of UW-Madison, UW System, the Board of Regents, [the Wisconsin Department of Administration] and the State Building Commission." We think the fact that the hospital may have exceeded some of the limitations imposed on it by the regents in this instance—for which it obviously has been called to account by the state—does not warrant the conclusion that it has forfeited or lost what we here conclude is its identity as an arm or agency of the state.

court correctly dismissed her claim against the hospital.

## II. "Official" Immunity

The general rule in Wisconsin is that a state officer or employee "is immune from personal liability for injuries resulting from acts performed within the scope of the individual's public office." *C.L. v. Olson*, 143 Wis. 2d 701, 710, 422 N.W.2d 614, 617 (1988) (citing *Lister v. Board of Regents*, 72 Wis. 2d 282, 300, 240 N.W.2d 610, 621 (1976)). There are three exceptions to the rule of state-officer/employee immunity: (1) where the conduct causing the injury is malicious, willful or intentional; (2) where the injury results from the negligent performance of a "ministerial" duty; and (3) where the officer or employee is aware of a danger of such quality or magnitude that he or she has an " ' "absolute, certain and imperative" ' " duty to act and does not. *Barillari v. City of Milwaukee*, 194 Wis. 2d 247, 257-58, 533 N.W.2d 759, 763 (1995) (quoted sources omitted). This appeal concerns only the second—the "ministerial" duty exception.

The supreme court has said that a public employee's duty is " 'ministerial . . . when it is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for [the exercise of] judgment or discretion.' " *K.L. v. Hinickle*, 144 Wis. 2d 102, 108, 423 N.W.2d 528, 530 (1988) (quoting *Lister*, 72 Wis. 2d at 301, 240 N.W.2d at 622). The rule was restated and reapplied by the court

in the very recent case of *Barillari v. City of Milwaukee*, 194 Wis. 2d 247, 257-58, 533 N.W.2d 759, 763 (1995).

■

As applied to this case, we consider de novo whether the therapist's duty in re-tying the restraints was so " 'absolute, certain and imperative' " as to leave nothing to her discretion. *See K.L.*, 144 Wis. 2d at 109, 423 N.W.2d at 531 (quoted source omitted). And we conclude that it was.

It is instructive, we think, to consider some examples of "discretionary" acts for which immunity has been found. They include (the list is not exclusive) the conduct of a police investigation[10] or a jail safety inspection,[11] a traffic engineer's decision whether to erect or replace a traffic sign at a particular location,[12] a safety inspector's determination that a school building is in good repair and in a safe condition,[13] a probation officer's determination that a parolee should be allowed to obtain a driver's license,[14] and a prosecutor's decision to order an inquest in a particular case.[15]

In this case, it was not Roelke's decision to restrain or not to restrain Brainard in his hospital bed—a decision that undoubtedly would involve discretion under

---

[10] *Olson v. 3M Co.*, 188 Wis. 2d 25, 50, 523 N.W.2d 578, 587-88 (Ct. App. 1994).

[11] *Wagner v. DHSS*, 163 Wis. 2d 318, 323, 471 N.W.2d 269, 271 (Ct. App. 1991).

[12] *Hjerstedt v. Schultz*, 114 Wis. 2d 281, 287, 338 N.W.2d 317, 320 (Ct. App. 1983).

[13] *Meyer v. Carman*, 271 Wis. 329, 331-32, 73 N.W.2d 514, 515 (1955).

[14] *C.L. v. Olson*, 143 Wis. 2d 701, 722, 422 N.W.2d 614, 622 (1988).

[15] *State ex rel. Kurkierewicz v. Cannon*, 42 Wis. 2d 368, 384-85, 166 N.W.2d 255, 263 (1969).

the cases just discussed. The decision to restrain him had been made by someone else. Roelke's duty, after unfastening Brainard's restraints and administering physical therapy to him, was no more or no less than to re-fasten them, as she acknowledged in her own deposition testimony. When asked what she did upon completion of the therapy session, she replied: "There is a hole in the bed that I would usually put the restraint through, one of the ties, and then I would tie it into a bow or a knot. . . . I have no idea what kind of a knot."

The straightforward and, according to Walker, simple act of re-tying a restraint one has untied only moments before is wholly dissimilar to the types of "discretionary" acts just mentioned. Rather, it seems to us to be exactly the type of duty or act that is so "absolute, certain and imperative"—one that is "define[d] . . . with such certainty that nothing remains for [the exercise] of judgment or discretion"—that it can lead only to rejection of any claim of governmental or "official" immunity.

██

We therefore conclude that the defendant Mary Ann Roelke is not entitled to immunity for the acts of negligence alleged against her in this action. Summary judgment dismissing her from the action was, therefore, inappropriate.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded for further proceedings consistent with this opinion. No costs are awarded to either party.

SUNDBY, J. (*concurring*). I am convinced that the inconsistencies and anomalies we find in our deci-

sions as to public officer and public body tort immunity stem from our failure to recognize that governmental tort immunity has been abrogated while public officer immunity has not. In *Holytz v. City of Milwaukee*, 17 Wis. 2d 26, 115 N.W.2d 618 (1962), the court abrogated governmental tort immunity. In *Lister v. Board of Regents*, 72 Wis. 2d 282, 300, 240 N.W.2d 610, 621 (1976), however, the court applied the general rule that a public officer is immune from tort liability to a person injured by his or her acts performed within the scope of his or her employment. However, the fact that the public officer may be immune does not mean that his or her public employer is immune from liability for the officer's act. In *Holytz*, the court said that, "[b]y reason of the rule of *respondeat superior* a public body shall be liable for damages for the torts of its officers, agents, and employees occurring in the course of the business of such public body." 17 Wis. 2d at 40, 115 N.W.2d at 625.[1]

The doctrine upon which governmental tort immunity was based was the ancient and fallacious maxim that "the king can do no wrong." *Id.* at 33, 115 N.W.2d at 621 (quoting *Britten v. Eau Claire*, 260 Wis. 382, 386, 51 N.W.2d 30, 32 (1952)). Hence, its interment by the court. To make clear the scope of its intended abrogation, the *Holytz* court said that, "henceforward, . . . the rule is liability—the exception is immunity." *Id.* at 39, 115 N.W.2d at 625. The court was concerned that subsequent decisions would emasculate its abrogation. However, what the *Holytz* court feared has come to pass. The rule as we now apply it is immunity, not liability, whether the action is brought against a public

---

[1] However, the doctrine of *respondeat superior* does not apply to civil rights' liability. *See Monell v. Department of Social Servs.*, 436 U.S. 658, 691 (1978).

officer or against the local government. We struggle, seemingly on a daily basis, to make sense out of something which makes no sense: the discretionary/ministerial dichotomy. Tort liability suits against public officers and employees and governmental bodies proliferate. Our burdensome and rapidly expanding caseload is hugely contributed to by governmental and public officer tort liability actions. When we see such conditions, the Code of Judicial Ethics urges us to speak out in the interest of the administration of justice. Supreme Court Rule 60.01(14).[2]

The *Holytz* court cited the Comment, *Municipal Responsibility for the Torts of Policemen*, 42 YALE L.J. 241 (1932). The commentator noted that, "[a]n overwhelming opinion throughout the world in favor of the assumption of community liability for the torts of public officers may be regarded as representing a growing moral conviction to which the courts should not remain impervious." *Id.* at 244-45, *quoted in Holytz*, 17 Wis. 2d at 35, 115 N.W.2d at 622-23.

While the Wisconsin courts have not been totally impervious to the responsibility of the community to redress those injured by the acts of its public officers and employees, we have on occasion absolved municipalities and public officers from liability for acts callous to the safety and well-being of those to whom the government and its officers owe a duty of care. In *Swatek v. County of Dane*, 192 Wis. 2d 47, 531 N.W.2d 45 (1995), the county and its jail nurse were held to be immune from tort liability for failing to hospitalize a

---

[2] Supreme Court Rule 60.01(14) provides: "A judge should contribute to the public interest by advising, suggesting and supporting rules and legislation which, from his or her judicial observation and experience, will improve the administration of justice."

jail inmate suffering from appendicitis where the jail nurse advised the jailer that "he's got 24 hours"[3] before the inmate's condition would require hospitalization and during that twenty-four hours the problem would become that of the jurisdiction for whom the county was holding Swatek. *See id.* at 54, 531 N.W.2d at 48.

The court did not come to grips with the issue in the case because it concluded that the jail nurse's negligence was "not germane" to the court's decision. *Id.* at 54 n.2, 531 N.W.2d at 47. The court failed to distinguish the discretion § 302.38(1), STATS., gave the jailer as to how medical treatment was to be provided inmates from the county's *respondeat superior* liability for the jail nurse's professional malpractice. *But see Gordon v. Milwaukee County*, 125 Wis. 2d 62, 69, 370 N.W.2d 803, 807 (Ct. App. 1985) (county liable only if county-employed psychiatrist failed to exercise "that degree of care and skill which would be exercised by the average psychiatrist acting in the same or similar circumstances.").

The *Swatek* court should have found that the county was liable for the jail nurse's negligence, if established, regardless of the nurse's immunity. We contributed to the confusion by complicating the analysis. We should not have been concerned whether the nurse's examination was discretionary or ministerial. The resolution of that dichotomy is irrelevant to the public employer's liability; what is relevant is the officer's or employee's negligence.

Section 893.80(4), STATS., does not alter the analysis or result. Public officer immunity is unaffected by the statute and governmental tort immunity is limited to acts of governance, as *Holytz* intended.

---

[3] Swatek testified that he thought the nurse meant he had twenty-four hours to live.

In the interests of simplicity and fairness, we should abrogate public officer or employee immunity. The reason for immunity no longer exists because any judgment rendered against a public officer or employee arising out of an act performed within the scope of the officer's or employee's employment will be entered against the public employer and not against the officer or employee. *See* § 895.46(1)(a), STATS. As to liability of the public body, the legislature has "capped" that. Section 893.80(3), STATS. Also, the existence of liability insurance means that the public officer and governmental tort immunity doctrines protect the insurance company's fisc and not the public treasury. The reason for the public officer and governmental tort immunity rules having disappeared, so should the rules.

If any justification for legislative action is necessary, it can be found in the dissenting opinion of Judge (later Justice) Cardozo, in *People v. Westchester County Nat'l Bank*, 132 N.E. 241, 249 (N.Y. 1921):

> The legislature might readjust the incidence of the burden, might establish a more equitable distribution between the individual and the public, through the voluntary acceptance of liability for a loss which was without a remedy when suffered. . . . The readjustment of these burdens along the lines of equality and equity is a legitimate function of the state as long as justice to its citizens remains its chief concern.

*Quoted in* Comment, 42 YALE L.J. at 247.

Wisconsin has a progressive tradition. It was among the first states to adopt a workers' compensation act, Laws of 1911, ch. 50, and an unemployment compensation act, Laws of 1931, ch. 20. The attempt of the *Holytz* court to further that tradition in the area of governmental tort liability foundered when the holding

of the *Holytz* court was, as the court feared, obfuscated by subsequent judicial decisions. In *Lifer v. Raymond*, 80 Wis. 2d 503, 511-12, 259 N.W.2d 537, 541-42 (1977), the court mistakenly declared that the words "legislative," "judicial," "quasi-legislative" and "quasi-judicial" were synonymous with "discretion." The legislature considered that it was codifying the *Holytz* decision when it enacted what is now § 893.80(4), STATS. However, it is clear that the *Holytz* court intended to except from abrogation of governmental tort immunity only the common-law immunities for acts of governance. However, the discretionary/ministerial dichotomy developed and since *Lister*, 72 Wis. 2d at 300-01, 240 N.W.2d at 621-22, the Wisconsin courts have attempted to make sense out of what does not make sense. The savings in the costs of investigation and litigation if public officer immunity is abrogated will more than repay the occasional judgment a public body or its insurer may have to pay as damages for the negligent acts of its officers, employees and agents. Further, with an adequate remedy available under state law, there will be less incentive to squeeze a plaintiff's case into the framework of 42 U.S.C. § 1983, where there is no cap on liability and the government may be subjected to ruinous costs of litigation if the plaintiff prevails. I urge the legislature to consider this problem.