Alma BICKNESE, M.D., Plaintiff-Appellant-
Petitioner,

v.

Thomas B. SUTULA and the Board of Regents of
the University of Wisconsin System, Defendants-
Respondents.†

Supreme Court

*No. 00–1825. Oral argument October 7, 2002.—Decided
May 2, 2003.*

2003 WI 31

(Also reported in 660 N.W.2d 289.)

† Motion for reconsideration denied 7-1-03.

For the plaintiff-appellant-petitioner, there were briefs by *Mary E. Kennelly, BethAnne Yeager,* and *Fox & Fox, S.C.,* Madison, and oral argument by *Michael R. Fox.*

For the defendants-respondents the cause was argued by *John R. Sweeney,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

¶ 1. WILLIAM A. BABLITCH, J. Alma Bicknese (Bicknese) alleges that Thomas Sutula (Sutula), who was chair of the Neurology Department at the University of Wisconsin-Madison, offered her a position as an assistant professor and that she relied upon this offer in turning down a comparable job offer from the University of New York-Buffalo. Bicknese seeks review of an unpublished decision of the court of appeals, which dismissed Bicknese's claims on the grounds that Sutula was immune from personal liability based on public officer immunity.

¶ 2. The issue here is not whether Bicknese is entitled to damages from Sutula. The issue is whether Bicknese can even sue Sutula. Sutula claims that as a public officer, he is shielded by public officer immunity. Bicknese argues that Sutula is not immune from suit because his conduct falls under an exception to public officer immunity; namely, the performance of a ministerial duty or actions that are malicious, willful, and intentional. Bicknese argues, in part, that Sutula had a ministerial duty to make the job offer consistent with the University of Wisconsin Faculty Policies and Procedures. Bicknese alleges that Sutula breached his ministerial duty when he failed to set the terms of the offer pursuant to these policies and procedures; therefore, he loses his public officer immunity. We agree with Bicknese. Accordingly, we reverse the decision of the court of appeals.

¶ 3. In order to have a full understanding of the facts and appreciate their significance, we first briefly review Bicknese's theory for recovering damages. Sutula, who was the chair of the Neurology Department at the University of Wisconsin-Madison (UW), offered Bicknese a position as an assistant professor in the department. One of the terms of the offer was a five-year tenure clock; that is, five years to qualify for tenure. Based on that offer, Bicknese turned down a comparable job offer from the University of New York-Buffalo (Buffalo), which also included a five-year tenure clock. Bicknese relied on the terms represented by Sutula in rejecting Buffalo's offer. As concluded by the circuit court:

> Under one reasonable view of the facts in this case, it could be inferred that Sutula offered Bicknese a position at Wisconsin and intentionally held back critical information concerning the likelihood that the

717

tenure clock for Bicknese would not in fact be extended from the three years required by the rules to five, despite the fact that he affirmatively promised her a five year tenure clock.

[A] reasonable fact finder could determine that . . . Sutula. . . [withheld] critical information regarding the hiring decision . . . with the purpose of inducing [Bicknese] to reject an offer of employment from the State University of New York at Buffalo.

¶ 4. As chair of the Neurology Department, Sutula had a ministerial duty to accurately state the terms under which the offer was extended to Bicknese in accordance with the UW Faculty Policies and Procedures. Sutula breached this ministerial duty when he failed to adhere to the specific directives of the UW Faculty Policies and Procedures in calculating Bicknese's tenure clock. Therefore, Sutula has no public officer immunity.

## I. FACTS AND PROCEDURAL HISTORY

¶ 5. Alma Bicknese was an assistant professor at the State University of New York-Stony Brook (Stony Brook), where she had been employed since 1992. In October 1996, Bicknese decided to leave Stony Brook and seek a position at another university. She applied for assistant professor positions at Buffalo and the UW. In January 1997, Bicknese received a job offer from Buffalo with a starting salary of $100,000, start-up funds for a laboratory, and a five-year tenure clock. Bicknese informed Buffalo that she could not accept the offer until she could compare it with an offer from the UW. When Bicknese informed Sutula that she had an offer from Buffalo, she claimed that Sutula assured her

that he was very interested in hiring her, and that he already considered her to be a member of the Neurology Department at the UW.

¶ 6. In February 1997, Bicknese visited the UW and met with Sutula and other members of the Neurology Department. Bicknese testified that Sutula told her that she would have a five-year tenure clock and that the UW "always went along with what the chairman recommended . . . so it was no big deal." Sutula admitted that he told Bicknese that she would have a five-year tenure clock; although, he confessed that he misstated the process when he represented to Bicknese that he had control over setting her tenure clock. On April 25, 1997, the Executive Committee of the Pediatric Neurology Department unanimously voted to hire Bicknese; however, a formal offer was not extended due to an initial incorrect posting of the position as a clinical appointment instead of a tenure-track position. The position had to be re-posted; consequently, a formal offer could not be made until the new posting time expired.

¶ 7. In May 1997, Bicknese told Sutula that she needed to make a decision regarding the offer from Buffalo. She testified that Sutula reassured her that "the job was [hers] for the taking" and that they were only waiting for the posting period to expire before sending a formal offer. Bicknese further claimed that Sutula told her to turn down the job offer from Buffalo. Bicknese testified that she was uncomfortable in turning down the offer from Buffalo without a formal offer from the UW, so Sutula sent her a "white copy" offer letter. The "white copy" offer letter detailed the terms of Bicknese's appointment and tenure, including a five-year tenure clock, but it was not signed or printed on letterhead. Bicknese claimed Sutula told her that the

"white copy" offer letter was the same document that she would receive once the posting period was complete. Based on these representations, Bicknese contacted Buffalo and informed them that she had accepted an offer from the UW.

¶ 8. Sutula disputed that he ever made a job offer to Bicknese, and claimed that the UW Medical School has no procedure for verbal job offers. He also testified that he did not tell Bicknese to turn down the offer from Buffalo, but conceded that he did tell her that she should let Stony Brook know that she would be accepting a position elsewhere. Sutula admitted that he told Bicknese throughout the process that he was committed to working out the details to eventually offer her a job. The trial evidence also contained a letter from Sutula to Bicknese, in which he stated: "[W]e remain firmly committed to the offer of a position, and we are all determined to do whatever is necessary to bring you to Madison . . . ."

¶ 9. Around the beginning of July 1997, Bicknese contacted Sutula because she had not yet received the formal offer from the UW. Bicknese testified that Sutula told her that the letter had not been sent because they needed to set a start date. A start date was set for October 1997, and Bicknese gave Stony Brook notice of her departure; however, Sutula contacted Bicknese about a week and a half later to inform her that there was a problem with the tenure clock calculation. For the first time, Sutula told Bicknese that in order to extend her tenure clock to five years, he would have to petition the University Committee. Bicknese testified that had she known about the tenure clock problem earlier, she would not have rejected the offer from Buffalo.

¶ 10. Sutula petitioned the University Committee for an extension of Bicknese's tenure clock from three

years to five years, but the Committee denied Sutula's request based on the clear provisions of § 7.04(H) of the UW Faculty Policies and Procedures, which allows extensions in only certain enumerated circumstances.[1] In light of the Committee's decision, the Department of Neurology determined that a three-year tenure clock would be insufficient for Bicknese to meet her tenure requirements. Sutula contacted Bicknese to inform her that the Neurology Department decided it would be "unreasonable to proceed with a formal job offer . . . ." Bicknese eventually accepted a position at St. Louis University in July 1998, which is a Tier II institution. In contrast, both the UW and Buffalo are Tier I institutions. Tier I institutions are considered preferable to Tier II schools because of their emphasis on research and their ability to attract grant money.

---

[1] Section 7.04(H) of the UW Faculty Policies and Procedures states:

7.04 THE MAXIMUM PROBATIONARY PERIOD

H. The maximum probationary period may be extended for an appropriate period in accordance with the provisions of UWS 3.04(3) and these policies. Extensions shall be granted in periods of one or two semesters (for academic year appointments), or six months or one year (for annual appointments).

1. Requests for extension of the probationary period with respect to childbirth or adoption shall be submitted by the faculty member in writing to the Vice Chancellor for Academic Affairs and Provost . . . .

2. Requests for extension of the probationary period on the grounds of significant responsibilities with respect to elder care or dependent care obligations, disability or chronic illness or circumstances beyond the control of the faculty member . . . shall be submitted in writing to the Vice Chancellor for Academic Affairs and Provost . . . .

¶ 11. Bicknese sued Sutula, the UW Board of Regents, the State of Wisconsin, the UW Executive Committee, and the UW Medical School, including its Department of Neurology, alleging promissory estoppel, intentional misrepresentation, and strict liability misrepresentation. The circuit court for Dane County, Judge Robert DeChambeau presiding, dismissed all the defendants except for Sutula and the Board of Regents (Board), but with respect to the Board, the court concluded that its only liability would be to pay the judgment if Sutula was found liable. As an affirmative defense, Sutula asserted that he was immune from liability as a public officer.

¶ 12. At trial, the jury was instructed on the promissory estoppel and intentional misrepresentation claims. A claim of promissory estoppel involves three elements: (1) whether the promise is one which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee; (2) whether the promise induced such action or forbearance; and (3) whether injustice can be avoided only by enforcement of the promise. *Hoffman v. Red Owl Stores, Inc.,* 26 Wis. 2d 683, 697–98, 133 N.W.2d 267 (1965). With respect to a claim of intentional misrepresentation, a plaintiff must sufficiently show the following: (1) the defendant made a representation of fact; (2) the representation of fact was untrue; and (3) the plaintiff must have believed such representations to be true and relied thereon to his or her detriment. *Gauerke v. Rozga,* 112 Wis. 2d 271, 277–78, 332 N.W.2d 804 (1983). Furthermore, a plaintiff must show that the untrue representation made by the

defendant was made with the intent to deceive and induce the plaintiff to act upon it to the plaintiff's pecuniary damage. *Id.*

¶ 13. The jury found in favor of Bicknese on the promissory estoppel claim.[2] Specifically, the jury found that Sutula promised Bicknese a job at the UW and that Sutula made representations of fact that Bicknese had a job at the UW Medical School. The jury awarded Bicknese $375,000 in damages: $225,000 for the wages Bicknese would have earned at Buffalo and $150,000 for the loss of reputation, embarrassment, and emotional distress. However, Bicknese did not prevail on the intentional misrepresentation claim. In particular, the jury answered "no" to the following question: "Did

[2] Although this court has held that public officer immunity does not bar a lawsuit for a breach of contract, *Energy Complexes, Inc. v. Eau Claire County*, 152 Wis. 2d 453, 464, 449 N.W.2d 35 (1989); we have not specifically determined whether public officer immunity applies in the context of contract-like actions, such as promissory estoppel. While a claim of promissory estoppel is somewhat similar to a contract cause of action, "[w]e deem it would be a mistake to regard an action grounded on promissory estoppel as the equivalent of a breach of contract action." *Hoffman v. Red Owl Stores, Inc.*, 26 Wis. 2d 683, 698, 133 N.W.2d 267 (1965). Thus, promissory estoppel might be more accurately characterized as quasi-contractual. "Promissory estoppel, therefore, is not a contractual theory but a quasi-contractual or equitable doctrine designed to prevent the harm resulting from . . . reasonable and detrimental reliance. . . ." *Karnes v. Doctors Hosp.*, 555 N.E.2d 280, 283 (Ohio 1990). Since neither party petitioned this court for a determination of whether promissory estoppel should be treated the same as a contract with respect to public officer immunity, we do not address this issue.

defendant [Sutula] make representations with the intent to deceive and induce plaintiff to act upon such representations?"

¶ 14. Sutula moved for judgment notwithstanding the verdict, renewing his argument that, as public officer, he was entitled to immunity from liability. The circuit court granted Sutula's motion and entered a judgment notwithstanding the verdict, dismissing Bicknese's claims. Bicknese appealed, and the court of appeals affirmed the circuit court's judgment, holding that Sutula is entitled to public officer immunity because neither the exception for a breach of a ministerial duty nor the exception for malicious, willful, and intentional conduct apply to Sutula. Bicknese petitioned this court for review.

## II. STANDARD OF REVIEW

¶ 15. The proper scope of the common law doctrine of public officer immunity presents a question of law that this court reviews de novo. *Kimps v. Hill,* 200 Wis. 2d 1, 8, 546 N.W.2d 151 (1996); *Kierstyn v. Racine Unified Sch. Dist.,* 228 Wis. 2d 81, 88, 596 N.W.2d 417 (1999). In addition, the review of a judgment notwithstanding the verdict is a question of law that is reviewed de novo. *Mgmt. Computer Serv. v. Hawkins, Ash, Baptie,* 206 Wis. 2d 158, 177, 557 N.W.2d 67 (1996).

## III. PUBLIC OFFICER IMMUNITY

¶ 16. Public officer immunity is a substantive limitation on the personal liability of public officers that developed out of the common law. *Lister v. Bd. of*

724

*Regents,* 72 Wis. 2d 282, 298–99, 240 N.W.2d 610 (1976). Public officer immunity does not originate from the state's sovereign immunity under the Wisconsin Constitution, but instead is based on considerations of public policy. *Id.* at 299. These considerations include:

> (1) The danger of influencing public officers in the performance of their functions by the threat of lawsuit; (2) the deterrent effect which the threat of personal liability might have on those who are considering entering public service; (3) the drain on valuable time caused by such actions; (4) the unfairness of subjecting officials to personal liability for the acts of their subordinates; and (5) the feeling that the ballot and removal procedures are more appropriate methods of dealing with misconduct in public office.

*Id.*

¶ 17. There are four recognized exceptions to public officer immunity that have developed in order to balance "the need of public officers to perform their functions freely against the right of an aggrieved party to seek redress." *Lister,* 72 Wis. 2d at 300. Public officer immunity does not apply to: (1) the performance of ministerial duties; (2) the performance of duties with respect to a "known danger;" (3) actions involving medical discretion; and (4) actions that are "malicious, willful, and intentional." *Willow Creek Ranch v. Town of Shelby,* 2000 WI 56, ¶ 26, 235 Wis. 2d 409, 611 N.W.2d 693. Of these four, only the performance of a ministerial duty and actions that are malicious, willful, and intentional are at issue in this case.

## A. Malicious, Willful, Intentional

■

¶ 18. The parties disagree whether the exception regarding malicious, willful, and intentional conduct should be read in the conjunctive (malicious, willful, *and* intentional) or the disjunctive (malicious, willful, *or* intentional). The source of the confusion stems from the use of both "and" and "or" by courts in stating the exception. The exception was first announced in *Lister* as "malicious, willful *and* intentional misconduct," but the court concluded in that case that "[t]he complaint contains no allegation of malicious *or* intentional misconduct on the part of [the defendant] which could subject him to personal liability." *Lister,* 72 Wis. 2d at 302 (emphasis added). Since *Lister,* Wisconsin courts have stated the exception in both the conjunctive and disjunctive; however, in the majority of cases, the exception has been recited in the conjunctive.[3]

---

[3] The following cases state the exception in the conjunctive: *Lodl v. Progressive N. Ins. Co.,* 2002 WI 71, ¶ 24, 253 Wis. 2d 323, 646 N.W.2d 314; *Willow Creek Ranch v. Town of Shelby,* 2000 WI 56, ¶ 26, 235 Wis. 2d 409, 611 N.W.2d 693; *Kierstyn v. Racine Unified Sch. Dist.,* 228 Wis. 2d 81, 90–91 n.8, 596 N.W.2d 417 (1999); *Kimps v. Hill,* 200 Wis. 2d 1, 10 n. 7, 546 N.W.2d 151 (1996); *Barillari v. Milwaukee,* 194 Wis. 2d 247, 257, 533 N.W.2d 759 (1995); *C.L. v. Olson,* 143 Wis. 2d 701, 711, 422 N.W.2d 614 (1988); *Ibrahim v. Samore,* 118 Wis. 2d 720, 728, 348 N.W.2d 554 (1984); *Kegonsa Joint Sanitary Dist. v. City of Stoughton,* 87 Wis. 2d 131, 147, 274 N.W.2d 598 (1979); *Lister v. Bd. of Regents,* 72 Wis. 2d 282, 302, 240 N.W.2d 610 (1976); *Caraher v. City of Menomonie,* 2002 WI App 184, ¶ 13 n.4, 256 Wis. 2d 605, 649 N.W.2d 344; *Rolland v. County of Milwaukee,* 2001 WI App 53, ¶ 8 n. 1, 241 Wis. 2d 215, 625 N.W.2d 590; *Sheridan v. City of Janesville,* 164 Wis. 2d 420, 425, 474 N.W.2d 799 (Ct. App.

¶ 19. Bicknese argues that mere "intentional" conduct, as opposed to negligent conduct, is sufficient to abrogate public officer immunity. We disagree. As will be discussed, this proffered interpretation is unquestionably over-inclusive. We recognize that people often act "intentionally;" thus, common sense dictates that the exception should not cover every "intentional" act, but rather intentional acts of a harmful or pernicious character. Moreover, the exception also refers to malicious and willful conduct. These additional terms indicate that the exception should only apply to ill-intended acts, as opposed to all "intentional" actions. One court has articulated the exception as " 'where the alleged acts involve malice, wantonness or *intent to injure,* rather than negligence.' " *Colon v. City of New Haven,* 758 A.2d 900, 902 (Conn. App. Ct. 2000) (emphasis added) (quoting *Evon v. Andrews,* 559 A.2d 1131, 1134 (Conn. 1989)). In addition, "malice" is defined as "the intent, without justification or excuse, to commit a wrongful act." *Black's Law Dictionary* 968 (7th ed. 1999).[4] Furthermore, this court has characterized the exception

---

1991); *Harmann v. Schulke,* 146 Wis. 2d 848, 852, 432 N.W.2d 671 (Ct. App. 1988); *Yotvat v. Roth,* 95 Wis. 2d 357, 366, 290 N.W.2d 524 (Ct. App. 1980).

The following cases recite the exception in the disjunctive: *Ottinger v. Pinel,* 215 Wis. 2d 266, 273, 572 N.W.2d 519 (Ct. App. 1997); *Walker v. Univ. of Wisconsin Hosp.,* 198 Wis. 2d 237, 249, 542 N.W.2d 207 (Ct. App. 1995); *Protic v. Castle Co.,* 132 Wis. 2d 364, 369, 392 N.W.2d 119 (Ct. App. 1986); *Graney v. Bd. of Regents,* 92 Wis. 2d 745, 766, 286 N.W.2d 138 (Ct. App. 1979). Notably, *Ottinger* and *Walker* cite *Barillari* for the exception, but *Barillari* states the standard in the conjunctive.

[4] "[M]alice in the legal sense imports (1) the absence of all elements of justification, excuse or recognized mitigation, and (2) the presence of either (a) an actual intent to cause the particular harm which is produced or harm of the same general nature, or (b)

pertaining to " 'malicious, willful and intentional conduct' " as a potential "remedy [for] gross municipal wrongdoing." *Willow Creek*, 235 Wis. 2d 409, ¶ 36 n.12 (quoting *Kierstyn*, 228 Wis. 2d at 90 n.8). Accordingly, the exception does not apply to mere intentional conduct of a public officer or employee without more. Therefore, the three terms should be read in conjunction as "malicious, willful, *and* intentional."

¶ 20. In this case, the jury found that Sutula made representations to Bicknese that she had a job at the UW Medical School even though this was not true. On the other hand, the jury found that Sutula did not make these representations with the intent to deceive Bicknese or to induce her to act upon such representations. It appears from Sutula's efforts that he genuinely wanted Bicknese to the join the faculty at the UW and was not trying to intentionally harm her. Thus, while Sutula presumably acted intentionally, he did not act maliciously with an intent to injure Bicknese. Admittedly, Sutula's tactics to persuade Bicknese to choose the UW and turn down the competing offer from Buffalo were arguably highly inappropriate; however, it does not appear that Sutula's actions were principally aimed at causing harm to Bicknese. Consequently, we hold that Sutula's actions must have risen to the level of malicious, willful, *and* intentional conduct in order to abrogate his public officer immunity. There is sufficient evidence from the record to support a finding that

the wanton and wilful doing of an act with awareness of a plain and strong likelihood that such harm may result."

*Black's Law Dictionary* 968 (7th ed. 1999) (quoting Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 860 (3d ed. 1982)).

728

Sutula's actions were not malicious, willful, and intentional. Accordingly, we uphold the jury verdict that answered this question in the negative. ·

## B. Ministerial Duties

¶ 21. This court has described the exception regarding a ministerial duty as follows:

> A public officer's duty is ministerial only when it is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion.

*Lister,* 72 Wis. 2d at 301 (footnote omitted). In analyzing a public officer's actions, "the nature of the specific act upon which liability is based, as opposed to the categorization of the general duties of a public officer . . . is determinative of whether an officer is immune from liability." *C.L. v. Olson,* 143 Wis. 2d 701, 716, 422 N.W.2d 614 (1988).

¶ 22. Bicknese argues that Sutula breached a ministerial duty when he failed to adhere to the directives set forth in chapter seven of the UW Faculty Policies and Procedures with respect to setting Bicknese's tenure clock. In response, Sutula asserts that he was under no ministerial duty because application of the UW Faculty Policies and Procedures involves discretionary judgment. Furthermore, Sutula claims that a promise of a job to Bicknese did not create a ministerial duty.

¶ 23. We agree with Sutula that a mere promise does not necessarily create a ministerial duty; however, we disagree that Sutula, in making the offer, had

discretion under the UW Faculty Policies and Procedures in determining Bicknese's tenure clock and representing a calculation to Bicknese that contravened these policies and procedures.

¶ 24. The court of appeals agreed with Sutula's arguments, concluding that "a promise does not by itself transform a discretionary act into a ministerial duty." *Bicknese v. Sutula,* No. 00–1825, unpublished slip op., ¶ 17 (Ct. App. Aug. 30, 2001). The court of appeals examined a case where police officers promised a sexual assault victim that they would arrest her ex-boyfriend at a specific date and time; however, the ex-boyfriend subsequently killed the victim after the police failed to follow through on their promise. *Barillari v. Milwaukee,* 194 Wis. 2d 247, 251–52, 533 N.W.2d 759 (1995). This court held that the police officers' "promise" to apprehend and arrest the ex-boyfriend did not transform their discretionary acts into ministerial duties. *Id.* at 251. While the court of appeals is correct that a mere promise does not ordinarily transform a discretionary act into a ministerial duty, there was more than just a promise made in this case.

¶ 25. At trial, the jury found that Sutula both: (1) promised Bicknese a job and (2) made representations that Bicknese indeed *had a job* at the UW Medical School. In other words, the jury found that Sutula made an offer of employment to Bicknese, and, because there is ample evidence to support this determination, this court will not upset that jury finding.[5] Sutula was not

---

[5] Contrary to the assertions in Justice Bradley's dissent, the majority is not engaging in a contract analysis; rather, we are merely upholding the jury's finding that Sutula offered Bicknese a job, in analyzing whether Sutula is entitled to public

required to make an offer of employment to Bicknese; however, when he did make the offer, he was obligated to abide by the specific directives under chapter seven of the UW Faculty Policies and Procedures, which were adopted pursuant to Chapter UWS 3 of the Wisconsin Administrative Code.[6]

officer immunity. It is the departmental executive committee, of which Sutula was a member, that selects the individuals to whom offers may be made, even if employment contracts are technically between faculty members and the UW. *See* UW Faculty Policies & Procedures § 7.03(B). In this case, the "white copy" offer letter, which is usually considered "the offer" by a potential faculty candidate, had signature lines for Sutula, the President/CEO of the Medical School, and the Dean of the Medical School.

[6] The relevant portions of Chapter UWS 3 of the Wisconsin Administrative Code state:

UWS 3.03 Appointments—general. The faculty of each institution ... shall develop rules relating to faculty appointments. Each person to whom an appointment is offered must receive an appointment letter in which an authorized official of the institution details the terms and conditions of the appointment, including but not limited to, duration of the appointment, salary, starting date, ending date, general position responsibilities, probation, tenure status, and crediting of prior service.

UWS 3.04 Probationary appointments. (1) Each institution's rules for faculty appointments shall provide for a maximum 7–year probationary period in a full-time position. ... Provision shall be made for the appropriate counting of prior service at other institutions and at the institution.

The relevant portions of chapter seven of the UW Faculty Policies and Procedures state:

7.04 THE MAXIMUM PROBATIONARY PERIOD.

A. The maximum probationary period is defined as the maximum amount of time a faculty member can be appointed in probationary ranks in the University. This period shall be specified for each individual at the time of his/her initial appointment.

¶ 26. This court has acknowledged that in certain cases, "once public officers choose in their discretion to act, they are bound by a ministerial duty to act in a certain manner." *Kierstyn,* 228 Wis. 2d at 93. For example, in a case where public officers made a discretionary decision to erect a highway warning sign, the officers were deemed to have a ministerial duty to place the sign in accordance with applicable administrative rules. *Chart v. Dvorak,* 57 Wis. 2d 92, 100–101, 203 N.W.2d 673 (1973). Similarly, in a case dealing with the construction of sewer systems, this court stated that while the design of sewer systems is discretionary, compliance with the plan design is a ministerial duty. *Allstate Ins. Co. v. Metro. Sewerage Comm.,* 80 Wis. 2d 10, 16–17, 258 N.W.2d 148 (1977). In sum, these cases reflect that a ministerial duty may be found where "public officers did not have to act at all—but if they did choose to act, *they faced a specific legal obligation to do so in a prescribed manner." Kierstyn,* 228 Wis. 2d at 93 (emphasis added).

¶ 27. As chairman of the Neurology Department, Sutula admitted that "one of my duties was to take care

B. In calculating a person's maximum probationary period, all periods of service, *but not to exceed three years,* at one-half time or greater in other institutions at ranks equivalent to instructor or above in this University, *shall be subtracted from the normal seven years* (emphasis added).

Although it would appear that Bicknese would have four years instead of three years on her tenure clock under § 7.04(B) (seven years minus three years), the last year in a probationary period is considered a "notice year." That is, the tenure determination is made at the beginning of that year; therefore, the tenure clock is referred to as "three years" since Bicknese would only have had three years in which to prepare for the tenure determination.

of [the] tenure clock and be familiar with how the procedure works." The process for calculating a tenure clock is prescribed under § 7.04(B) of the UW Faculty Policies and Procedures, which states: "In calculating a person's maximum probationary period, all previous service, but not to exceed three years ... *shall* be subtracted from the normal seven years." UW Faculty Policies and Procedures § 7.04(B) (emphasis added). The only exceptions to this calculation are enumerated under § 7.04(H) and include: childbirth, adoption, dependent care, and extenuating circumstances such as chronic illness or disability. None of these exceptions applied to Bicknese. Furthermore, the exceptions under § 7.04(H) provide for leave that is ordinarily no more than one year. In this case, Sutula told Bicknese that her tenure clock would be five years instead of three — an extension of two years.

¶ 28. Under the clear mandate of § 7.04 of the UW Faculty Policies and Procedures, Sutula had no discretion in setting Bicknese's tenure clock. The fact that Sutula, once he made the offer, was *required* to act in a certain manner, distinguishes this case from this court's recent decision in *Kierstyn*. In *Kierstyn*, a benefits specialist, who was employed by the Racine Unified School District (District), was authorized to give District employees information about their union benefits; however, he was not an agent of the Wisconsin Retirement System (WRS) nor could he authoritatively represent to District employees what WRS benefits they were entitled to receive. *Kierstyn*, 228 Wis. 2d at 85. In contrast, Sutula admitted that as head of the department, his duties included recruiting and hiring new faculty, which entailed calculating tenure clocks.

¶ 29. It is apparent that Sutula was aware of his duties in this regard based on the "white copy" offer

letter he sent to Bicknese. Upon being offered a faculty position, Bicknese was entitled to be accurately apprised of the terms of her appointment, including her tenure clock calculation, pursuant to § UWS 3.03 of the Wisconsin Administrative Code. Section UWS 3.03 requires that "[e]ach person to whom an appointment is offered must receive an appointment letter in which an authorized official of the institution details the terms and conditions of the appointment, including . . . [the] crediting of prior service." Consistent with § UWS 3.03, the "white copy" offer letter sent to Bicknese detailed the terms of her appointment, including a five-year tenure clock. Thus, unlike the benefits specialist in *Kierstyn,* who had no authority or duty to provide retirement benefits information to District employees, Sutula, once he chose to make an offer, had a duty to inform Bicknese of the terms of her appointment in accordance with § UWS 3.03, as evidenced by the detailed information provided in the "white copy" offer letter.

¶ 30. In essence, Sutula's acknowledged duties of hiring new faculty and setting their tenure clocks, differentiate this case from *Kierstyn,* where the benefits specialist had neither the authority nor a duty to provide retirement benefits information. The specialist in *Kierstyn could* provide retirement benefits information, but he was not required to do so. Consequently, this court held that the specialist did not breach a ministerial duty when he provided incorrect retirement benefits information to an employee. *Kierstyn,* 228 Wis. 2d at 94. The court in *Kierstyn* emphasized that the benefits specialist was "under no duty . . . under Wisconsin law [or] . . . under his contractual arrangement" to advise employees regarding their retirement benefits. *Id.* at 91. Contrary to the situation in *Kierstyn,*

734

Sutula, once he chose to make an offer, was *required* to accurately calculate Bicknese's tenure clock and inform her of the calculation. Sutula was bound by a specific legal obligation to set the tenure clock in accordance with § 7.04 of the UW Faculty Policies and Procedures, which provided for only a three-year tenure clock in Bicknese's case. Sutula's duty in this regard was "absolute, certain and imperative ... with such certainty that nothing remains for judgment or discretion." *Lister,* 72 Wis. 2d at 301 (footnote omitted).

¶ 31. Sutula argues that his attempt to lengthen Bicknese's tenure clock from three to five years indicates that there was room for discretion in setting her tenure clock. We are not persuaded. Sutula's appeal to the University Committee to adjust Bicknese's tenure clock does not change the fact that Sutula had a duty to set Bicknese's tenure clock in a particular manner under § 7.04 of the UW Faculty Policies and Procedures. Sutula's apparent misimpressions about setting Bicknese's tenure clock do not convert a clear ministerial duty into a discretionary act. In rejecting Sutula's request, the University Committee explicitly referred to the procedure that must be followed under § 7.04(B) and the lack of any applicable exception under § 7.04(H) in this case. Moreover, despite his assertion of discretion, Sutula himself admitted at trial that he misstated the process when he indicated to Bicknese that he had control over setting her tenure clock.

¶ 32. Accordingly, we hold that Sutula is not entitled to public officer immunity because in making the job offer to Bicknese, he was under a ministerial duty to correctly set the terms of the offer, including calculating Bicknese's tenure clock, in accordance with the specific directives under chapter seven of the UW Faculty Policies and Procedures. Therefore, the jury's finding

and damages award in favor of Bicknese on her promissory estoppel claim must be reinstated.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 33. SHIRLEY S. ABRAHAMSON, C.J., did not participate.

¶ 34. ANN WALSH BRADLEY, J. *(dissenting).* Two very subtle passages in the majority's opinion deserve attention. One has a substantial effect on the outcome of this case and the other affects the development of our law. Both could easily go unnoticed.

¶ 35. The first is a subtle shift in the analysis set forth in ¶ 25 of the opinion which erroneously transposes a promise of an offer of employment into an offer of employment. This seemingly slight shift is outcome determinative in this case.

¶ 36. The second is set forth in footnote 2, which at first blush is a rather innocuous statement indicating that "public officer immunity does not bar a lawsuit for breach of contract." However, in making this statement, the majority reaches out and arguably answers in a footnote an issue it need not address. Apparently, the majority fails to recognize that the extent to which public officer immunity applies in contract actions is an unsettled area of law.

¶ 37. Because I believe the subtle shift in analysis from a promise of an offer to an actual offer distorts the outcome of this case, and that the majority unnecessarily addresses, without adequate analysis or briefing, an otherwise unsettled area of law, I respectfully dissent.

I

¶ 38. At the outset of the discussion of public officer immunity, the majority correctly and artfully

736

analyzes the "malicious, willful, and intentional" exception to immunity. It next discusses the breach of ministerial duty exception to immunity and appropriately sets forth the oft-quoted definition of ministerial duty which requires that the public officer's task be specifically prescribed and defined as to time, mode and occasion for its performance, leaving nothing for judgment or discretion.

¶ 39. Citing to the case of *C.L. v. Olson,* the majority correctly emphasizes that in analyzing public officer immunity we look to "the nature of the specific act upon which liability is based . . . ." *C.L. v. Olson,* 143 Wis. 2d 701, 422 N.W.2d 614 (1988). But without explanation, the majority then transposes the "act upon which liability is based" from a promise of an offer to an actual offer.

¶ 40. The cause of action before this court is one of promissory estoppel. It is not a cause of action for breach of contract. The "act upon which liability is based" is a promise of an offer and not an actual offer. This case was pled on the basis of a promise of an offer, it was tried on the basis of a promise of an offer, and indeed the jury found liability on the basis of a promise of an offer. The jury answered "yes" to the first question of the special verdict which asked: "Did defendant *promise* plaintiff a job at the University of Wisconsin?" (emphasis supplied).

¶ 41. The subtle shift in analysis appears in ¶ 25 of the opinion when the majority focuses on another question set forth in the special verdict which addressed the tort of misrepresentation: "Did defendant (Sutula) make representations of fact that plaintiff had a job at University of Wisconsin Medical School?" Curiously, the majority takes the "yes" answer of the jury to this question and applies it to a different legal analysis. The

737

majority transforms the jury findings regarding the existence of a tort of misrepresentation into findings related to elements necessary to create a binding contract.

¶ 42. The majority, in misconstruing the jury finding in the tort cause of action, states: "In other words, the jury found that Sutula made an offer of employment to Bicknese . . . " Majority op., ¶ 25. Even the plaintiff acknowledged that Sutula could not make a contractual offer of employment. Only the University could make such an offer. That is why the plaintiff brought this case based on promissory estoppel and not based in contract.

¶ 43. Yet, the majority in ¶ 25 transposes the act of a promise of an offer, together with a jury finding addressing the tort of misrepresentation, into an actual contractual offer. Why? Because without this subtle change the majority's analysis collapses. The remaining analysis of the opinion relies on this misconstruction. Without an actual offer here, there is no ministerial duty.

¶ 44. The facts in this case present a series of negotiations in which a promise of an offer of employment was made. Such a promise, made in the course of negotiations, does not meet the definition of a ministerial duty. The basis for which liability is imposed here, i.e., the promise of an offer by Sutula, is not a specific task which the law imposes and which so certainly defines "the time, mode and occasion for [making the promise of an offer] . . . that nothing remains for judgment or discretion." *Lister v. Bd. of Regents,* 72 Wis. 2d 282, 301, 240 N.W.2d 610 (1976).

¶ 45. Even the majority acknowledges that such a promise of an offer made in the course of negotiations is not so "absolute, certain and imperative" and so defined in "time, mode and occasion of its performance" to meet

738

the stringent definition of a ministerial duty. But what the majority giveth, it taketh away, when it subtly transposes the basis of liability from the promise of an offer to making an offer, and thus adulterates its remaining analysis. The majority states: "We agree with Sutula that a mere promise does not necessarily create a ministerial duty; however, we disagree that Sutula, *in making the offer . . . .*" (emphasis supplied). Majority op., ¶ 23.

¶ 46. A ministerial duty did not exist because Sutula's promise of an appointment did not constitute an offer of an appointment. The majority advances that "Sutula had a ministerial duty to make the job offer consistent with the University of Wisconsin Faculty Policies and Procedures." Majority op., ¶ 2. The specific Faculty Procedure that created the ministerial duty states that each person "to whom an appointment is offered" must receive an appointment letter outlining various terms including the tenure clock. UW Faculty Policies and Procedures § 7.04(B).

¶ 47. Section 7.04(B) is not triggered when an appointment is promised. Rather, it is triggered when an appointment is actually offered. In order to circumvent this fatal distinction, the majority attempts to blur the distinction by re-characterizing the finding of the jury.

¶ 48. As noted above, in ¶ 25 the majority states: "In other words, the jury found that Sutula *made an offer* of employment to Bicknese, and, because there is ample evidence to support this determination, this court will not upset that jury finding." (Emphasis supplied.) Even though the majority says it is simply upholding the jury's finding that there was an "offer," the reality is that the majority is independently making its own conclusion that an "offer" existed.

739

¶ 49. The majority must make this re-characterization so that it can use § 7.04(B) as the basis for imposing the ministerial duty. However, the question asked of the jury was not whether Sutula made an offer, but rather "Did defendant promise plaintiff a job at the University of Wisconsin?" Thus the subtle shift in analysis and re-characterization of the jury finding fundamentally distorts the outcome of this case.

## II

¶ 50. Additionally, I take issue with footnote 2 of the majority's opinion. Footnote 2 begins with an introductory statement which concludes that "public officer immunity does not bar a lawsuit for a breach of contract."

¶ 51. The majority should not make this conclusion for three reasons. First and foremost, the conclusion arguably settles an otherwise unsettled area of law even though the making of the conclusion has no impact on the majority's analysis of this case. Second, the majority does not discuss its reasoning for making the conclusion. Third, the parties have not adequately briefed this issue. Nevertheless, the majority makes the conclusion, and in a footnote no less.

¶ 52. I pause to voice my concern about this court's growing tendency to reach out and address, in footnotes, issues that it need not address. *See Town of Beloit v. County of Rock*, 2003 WI 8, ¶¶ 72–79, 259 Wis. 2d 37, 657 N.W.2d 344 (Abrahamson, C.J., dissenting). The problem is exacerbated here because the majority makes its bald assertion in an unsettled area of law without adequate analysis or briefing. This problematic approach hampers the development of our law because when the issue is squarely presented in the future, fully

briefed and argued, it will be unclear what effect should be given to the majority's cursory footnote resolution.

¶ 53. Contrary to the majority's statement in footnote 2, the extent to which public officer immunity applies in contract actions is unsettled. In *Energy Complexes,* we addressed whether a contract claim against Eau Claire County was barred either by common law immunity for counties or by statutory immunity for counties under Wis. Stat. § 893.80(4). We concluded that these types of immunity do not apply to breach of contract actions. *Energy Complexes, Inc. v. Eau Claire County,* 152 Wis. 2d 453, 464–65, 449 N.W. 2d 35 (1989). In *Willow Creek Ranch, L.L.C. v. Town of Shelby,* 2000 WI 56, ¶ 35, 235 Wis. 2d 409, 611 N.W.2d 693, we described *Energy Complexes* as holding that "Wis. Stat. § 893.80(4) does not grant immunity to actions based in contract." Although *Energy Complexes* did not deal specifically with public officer immunity, its holding indicates that public officer immunity analysis may not be applicable in contract actions.

¶ 54. However, other cases apply the breach of ministerial duty analysis in connection with contract actions, thereby implying that common law immunity and statutory immunity analysis are applicable in contract actions. In *Major v. County of Milwaukee,* 196 Wis. 2d 939, 944–945, 539 N.W.2d 472 (Ct. App. 1995), the court of appeals concluded that Milwaukee County and its officers had discretion to determine the terms of the sale of the property, but once those terms were set in the contract, the County was under a ministerial duty to comply with the terms of the contract. We discussed the *Major* case in *Kierstyn v. Racine Unified School District,* 228 Wis. 2d 81, 94, 596 N.W.2d 417 (1999), in which we stated: "while the public officers in *Major* were not obligated to sell county property or were free

to sell it on their own terms, once they signed a sales contract they were under a ministerial duty to follow the terms of that contract." As these cases indicate, the extent to which public officer immunity applies in contract actions is unsettled.

¶ 55. Further, because public officer immunity may not be applicable to contract claims, we need to address as a threshold question whether a promissory estoppel claim is to be treated the same as a contract. Footnote 2 recognizes that public officer immunity may not be applicable to promissory estoppel claims such as the one in this case. The court nevertheless decides that since the parties did not adequately raise the issue, it would apply the public officer immunity analysis even though it might not be applicable.

¶ 56. I suppose that, if public officer immunity does not apply to promissory estoppel claims, the fact that the majority nevertheless proceeds to examine an exception to public officer immunity does not affect the outcome of this case. However, I agree with Justice Sykes that we "should not expound upon an exception to an immunity defense if the immunity defense is unavailable in the first place." Justice Sykes' dissent, ¶ 66.

¶ 57. In sum, I conclude that the shift in analysis from a promise of an offer to an actual offer distorts the outcome of this case and that there is no breach of a ministerial duty. Additionally, I disagree with the majority's reaching out in a footnote and arguably settling, without adequate analysis or briefing, an issue it need not address. Accordingly, I respectfully dissent.

¶ 58. DIANE S. SYKES, J. *(dissenting).* This case suffers from significant analytical confusion. The majority has evaluated the applicability of various ex-

ceptions to public officer immunity without first addressing the question of whether public officer immunity even applies to the claim on which the plaintiff prevailed in this case. This confusion is not entirely the court's fault. The lower courts made the same mistake (except for the concurrence in the court of appeals), and the plaintiff's positions have been inconsistent in the circuit court and on appeal. The briefs in this court were at best incomplete on this subject. But this threshold question must be addressed.

¶ 59. The jury in this case rejected Bicknese's misrepresentation claim. Bicknese prevailed only on her promissory estoppel cause of action. Promissory estoppel is not a tort. Promissory estoppel is a species of contract claim. *Hoffman v. Red Owl Stores, Inc.,* 26 Wis. 2d 683, 693–94, 133 N.W.2d 267 (1965); Restatement (Second) of Contracts § 90 (1981 & Supp. 2002).

¶ 60. This court first recognized the promissory estoppel cause of action in *Hoffman,* adopting § 90 of the Restatement (First) of Contracts. *Hoffman,* 26 Wis. 2d at 696. The language of § 90 of the Restatement (Second) is substantially the same as the first:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

Restatement (Second) of Contracts § 90.

¶ 61. This is the language of contract law ("a promise ... is binding"; "enforcement of the promise"; "remedy ... for breach may be limited"). Indeed, the

743

commentary to the second Restatement says "[a] promise binding under this section *is a contract.*" *Id.,* § 90, cmt. d (emphasis added).

¶ 62. It is true that in Wisconsin, a promissory estoppel cause of action is not considered the equivalent of a breach of contract action in that the recovery allowed in a promissory estoppel case may not necessarily include full breach of contract damages. *Hoffman,* 26 Wis. 2d at 698; Restatement (Second) of Contracts § 90, cmt. d. Nevertheless, there is nothing in *Hoffman* to indicate that the court was creating a new tort as opposed to recognizing a new contract remedy.[1] After all, the court adopted a section from the Restatement of *Contracts,* and repeatedly cited to *contract* treatises and articles. *Hoffman,* 26 Wis. 2d at 694–99. Clearly, the court in *Hoffman* was filling a gap in the law of contracts, not the law of torts.

¶ 63. Justice Bradley's dissent asserts that "the extent to which public officer immunity applies in contract actions is an unsettled area of law." Justice Bradley's dissent, ¶ 36. I do not agree. In *Energy Complexes, Inc. v. Eau Claire County,* 152 Wis. 2d 453, 464–65, 449 N.W. 2d 35 (1989), this court held that neither common law nor statutory public officer immu-

---

[1] This court has said that "the basis of promissory estoppel is akin to the contractual basis for reformation." *Ahnapee & W. Ry. Co. v. Challoner,* 34 Wis. 2d 134, 145, 148 N.W.2d 646 (1967). In *Mackenzie v. Miller Brewing Co.,* 2001 WI 23, ¶ 25, 241 Wis. 2d 700, 722–23, 623 N.W.2d 739, this court commented on a cause of action that the plaintiff there might have asserted had the facts been more favorable: "Similarly, there might be a cause of action sounding in contract under promissory estoppel. . . . A cause of action for promissory estoppel in the employment context, like a contract cause of action based on an employee handbook, is in accordance with Wisconsin contract law."

nity applies to contract claims. *Energy Complexes,* 152 Wis. 2d at 456, ("We conclude that neither common-law immunity nor statutory immunity under sec. 893.80(4) bars the lawsuit of Energy Complexes, Inc.").

¶ 64. *Energy Complexes* involved breach of contract, promissory estoppel, and quantum meruit claims against a county stemming from the conduct of county officials in connection with a construction contract. *Energy Complexes,* 152 Wis. 2d at 459. This court declared unequivocally that common law and statutory public officer immunity defenses are unavailable in contract claims. *Id.* at 464.

¶ 65. Justice Bradley's dissent cites *Kierstyn v. Racine Unified School District,* 228 Wis. 2d 81, 596 N.W.2d 417 (1999), and *Major v. County of Milwaukee,* 196 Wis. 2d 939, 539 N.W.2d 472 (Ct. App. 1995), as support for the notion that common law or statutory public officer immunity might apply to contract actions. I do not see how this could be so. *Kierstyn* was a negligence and negligent misrepresentation case; *Major* involved a misrepresentation claim. Neither involved a contract cause of action, whether breach of contract, promissory estoppel, or otherwise.

¶ 66. *Energy Complexes* applies here, as the concurrence in the court of appeals noted. *Bicknese v. Sutula,* No. 00–1825, unpublished slip op., ¶ 27 (Wis. Ct. App. Aug. 30, 2001) (Roggensack, J., concurring). Accordingly, we need not evaluate the various exceptions to public officer immunity because public officer immunity does not apply to promissory estoppel claims, which sound in contract.[2] We should not expound upon

---

[2] It is technically true, as the majority states, that "[n]either party petitioned this court for a determination of whether promissory estoppel should be treated the same as a contract

an exception to an immunity defense if the immunity defense is unavailable in the first place.

¶ 67. Sutula and the Board of Regents have argued in the alternative that constitutional sovereign immunity applies, that this requires compliance with the claim procedures of Wis. Stat. § 775.01, and that Bicknese failed to plead or prove compliance with the statute. *See* Wis. Const. art. IV, § 27; Wis. Stat. § 775.01. Constitutional sovereign immunity is distinct from

---

with respect to public officer immunity." Majority op., ¶ 13 n.2. However, both the plaintiff's petition for review and the defendants' response to the petition for review raised and discussed the issue of whether, assuming that promissory estoppel is a contract claim, public officer immunity applies. *See, e.g.,* Petition for Review at 18 ("Since immunity does not apply to contract actions, there is no need for the ministerial duty exception to abrogate governmental immunity."); Response to Petition for Review at 19 ("[P]etitioner argues that a promissory estoppel claim is really a contract theory, and points out that immunity does not shield government officials from breach of contract actions."). The parties also debated the tort/contract alternatives in their briefs. The issue is properly before the court and should not be sidestepped. "Once a case is properly before us, it is this court's obligation to resolve the issues presented regardless of the court's original reason for accepting the case." *State v. Schumacher,* 144 Wis. 2d 388, 410 n.15, 424 N.W.2d 672 (1988) (quoting *State v. Strege,* 116 Wis. 2d 477, 492, 343 N.W.2d 100 (1984)). However, because the majority has specifically declined to address this threshold question, majority op., ¶ 13 n.2, this case should not be read to mean that public officer immunity now applies to contract actions or that *Energy Complexes, Inc. v. Eau Claire County,* 152 Wis. 2d 453, 449 N.W.2d 35 (1989), has been overruled sub silentio.

public officer immunity.[3] *Lodl v. Progressive N. Ins. Co.,*
2002 WI 71, ¶ 22 n.2, 253 Wis. 2d 323, 336, 646 N.W.2d
314.

¶ 68. Constitutional sovereign immunity is a de-
fense to personal jurisdiction:

> The concept of sovereign immunity in this state
> derives from art. IV, sec. 27 of the Wisconsin Constitu-
> tion, which provides: 'The legislature shall direct by law
> in what manner and in what courts suits may be
> brought against the state.' From this provision the rule
> developed that the state cannot be sued without its
> consent. This immunity is procedural in nature and, if
> properly raised, deprives the court of personal jurisdic-
> tion over the state.

*Lister v. Bd. of Regents,* 72 Wis. 2d 282, 291, 240 N.W.2d
610 (1976). "There is no question that the board of
regents is an arm or agency of the state for sovereign
immunity purposes." *Walker v. Univ. of Wis. Hosps.,* 198
Wis. 2d 237, 243, 542 N.W.2d 207 (Ct. App. 1995).

¶ 69. Pursuant to Article IV, Section 27 of the
constitution, the state has consented to be sued only in
the manner provided in Wis. Stat. § 775.01, and com-

---

[3] Public officer immunity, whether state or municipal, de-
rives from the common law. *Lodl v. Progressive N. Ins. Co.,* 2002
WI 71, ¶¶ 22–24, 253 Wis. 2d 323, 336, 646 N.W.2d 314. Public
officer immunity was partially abrogated by this court in *Holytz
v. City of Milwaukee,* 17 Wis. 2d 26, 37, 115 N.W.2d 618 (1962).
However, *Holytz* specifically retained immunity for the discre-
tionary acts of public officers; discretionary act immunity for
municipal public officers was subsequently codified in Wis. Stat.
§ 893.80(4). *Lodl,* 253 Wis. 2d at 336, ¶ 22. "Immunity for
public officers and employees, both state and municipal, is
based largely upon public policy considerations that spring from
the interest in protecting the public purse and a preference for
political rather than judicial redress for the actions of public
officers." *Id.* at ¶ 23.

pliance with the statute is a condition precedent to suit. *See State v. P.G. Miron Const. Co.,* 181 Wis. 2d 1045, 1053, 512 N.W.2d 499 (1994); *Boldt v. State,* 101 Wis. 2d 566, 572, 305 N.W.2d 133 (1981).

¶ 70. As noted above, the tort claim against Sutula was rejected by the jury. The promissory estoppel claim sought to establish and enforce a quasi-contract not between Bicknese and Sutula but between Bicknese and the Board of Regents, based on Sutula's promise.[4] This sort of claim is subject to a sovereign immunity defense, which the defendants pleaded in their answer and raised in their summary judgment motion prior to trial. The circuit court inexplicably failed to address it.

¶ 71. Sutula and the Board of Regents preserved and argued this defense on appeal. Having concluded that Sutula is not entitled to public officer immunity because of the presence of a ministerial duty, the majority is obliged to address the sovereign immunity defense. The majority does not explain why it takes no notice of Article IV, Section 27 of the constitution and Wis. Stat. § 775.01.

¶ 72. Interestingly, just after the circuit court announced, post-verdict, that it would grant the defendants' motion to dismiss on public officer immunity grounds, counsel for Bicknese argued that the promissory estoppel claim was a contract action, and as such, public officer immunity did not apply. She told the

---

[4] As Judge Roggensack noted in her concurrence in the court of appeals, Bicknese was not seeking to be employed by Sutula but, rather, by the university, so "if the court were to create an equitable contract of employment under a promissory estoppel theory, it could not create it between Bicknese and Sutula." *Bicknese v. Sutula,* No. 00–1825, unpublished slip op., ¶ 27 (Wis. Ct. App. Aug. 30, 2001) (Roggensack, J., concurring).

court: "the promissory estoppel claim should be treated more as a contract as opposed to a tort. As a contract action, public official immunity does not apply at all . . . it is a contract action, and the action should lie directly then against the board of regents." Plaintiff-Appellant-Petitioner's Appendix at 22. Bicknese's counsel had earlier argued in opposition to summary judgment that promissory estoppel "is not a tort as that term has been defined by the courts." Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment at 23. She maintained this argument in the court of appeals. Plaintiff-Appellant's Court of Appeals Brief at 4–5.

¶ 73. Bicknese's argument in this court, however, was quite different:

> Dr. Sutula does suggest that if Dr. Bicknese's promissory estoppel claim sounded in contract, she could not enforce a contract between herself and the UW because of sovereign immunity. Sovereign immunity is not an issue here. Dr. Bicknese's promissory estoppel claim did not seek to enforce a contract, but to recover damages resulting from the detrimental reliance induced by Dr. Sutula. This claim sounds in tort, as did her entire complaint.

Reply Brief of Plaintiff-Appellant-Petitioner at 9 n.11.

¶ 74. Thus, Bicknese has argued that promissory estoppel is both a contract claim (when she wants to avoid a defense based on public officer immunity) *and* a tort claim (when she wants to avoid a defense based on sovereign immunity). She cannot have it both ways.[5] Her first argument is correct, and she has cited no

---

[5] "The equitable doctrine of judicial estoppel, as traditionally applied in this state, is intended to protect against a litigant playing fast and loose with the courts by asserting inconsistent positions. The doctrine precludes a party from asserting a position in a legal proceeding and then subsequently asserting

authority in support of her second, contradictory argument. Nor has Bicknese responded to the sovereign immunity defense on the merits.

¶ 75. The record reflects that Bicknese has neither pleaded nor proved compliance with Wis. Stat. § 775.01. The promissory estoppel claim is barred by sovereign immunity. I would affirm the court of appeals, although on different grounds.

---

an inconsistent position." *State v. Petty*, 201 Wis. 2d 337, 347, 548 N.W.2d 817 (1996) (internal citations and quotation marks omitted). Historically, this doctrine, when applied to inconsistent positions taken within the same case, is known as the "mend the hold" doctrine, *see, Harbor Ins. v. Cont'l Bank Corp.*, 922 F.2d 357, 362–65 (7th Cir. 1990), although this terminology has not previously been used in Wisconsin. That the majority declines to address the threshold issue of whether promissory estoppel sounds in contract, and neglects to address the sovereign immunity defense, only serves to reward this sort of game-playing.